Nott, J.,
delivered the opinion of the court:
The following I regard as the only ultimate or specific facts in the case, and they present all of the legal questions which the case involves:
I. During the year 1865 Maj. Gen. George EL Thomas commanded the Department of the Cumberland, and Bvt. Brig. Gen. J. L. Donaldson had been assigned to duty as chief quartermaster of the department, in accordance with the Act ith July, 1864. (13 Stat. L., p. 394.) The official relations between General Thomas and his chief quartermaster were of the most intimate and informal character. All the measures taken by the chief quartermaster to procure supplies and means of transportation for the army were known generally to General Thomas, and received his implied approval and assent: but no specific or formal orders were issued by him in regard to these measures. The chief quartermaster was also informed by General Thomas of a series of military emergencies running through the months of December, 1864, and January, February, and March, 1865, requiring the utmost exertions of the Quartermaster Department, but no formal order was ever issued by General Thomas *193 declaring these emergencies, or any of them, or directing the purchase in open market of the necessary supplies or means of transportation then required by the army under his command.
II. On the 12th day of December, 1864, Oapt. Henry Howland, assistant quartermaster, was assigned to duty at Nashville, by the order of the chief quartermaster, and was charged with the duty of purchasing and procuring public animals, and he remained there on that duty until the 11th March, 1865. During this period horses and mules needed for the movements of the army could not be procured at other depots, and were purchased without advertisement in open market, with the knowledge and approval of the chief quartermaster, but without any express or formal order to that effect being issued by him. On the 8th day of March, 1865, Captain Howland reported to the chief quartermaster, (who was also then at Nashville,) in writing, that the price which he was then paying for mules was less than was then paid in other military depots, and recommended that, in order to supply the immediate requirements of the Army of the Cumberlaud, he be authorized to increase the price over the existing rates to $160, $167.50, and $175, for 14, 14J, and 15 hand mules. He also reported at the same time that, in the event of being thus authorized, he could secure from fifteen hundred to two thousand mules within the next thirty days. The chief quartermaster, on the same day, returned the report to Captain Howland, indorsed with his approval. The report did not refer to the contract hereinafter set forth, nor specify in terms 'whether the mules were to be purchased by advertisement or by purchase in open market; but the intent of both the chief quartermaster and Captain Howland was that the mules should be procured without advertisement and in the most expeditious manner possible.
III. On the 9th day of March, 1865, Captain Howland, acting under the authority before referred to, entered into the following written contract with the claimants, and delivered the same to their agent at Nashville:
“Oeeice Assistant Quartermaster,
“ Nashville, Term., March 9,1865.
u I hereby obligate myself, as an officer of the G-overnment, to receive of T. T. Taylor, agent, one thousand (1,000) good *194 serviceable mules, that will inspect up to tlie required standard; said mules to be delivered in Nashville, Tenn., ou or before the 20th day of April next, at the following prices, to wit: One hundred and sixty, (160,) one hundred and sixty-seven and fifty one-hundredths, ($167.50,) one hundredaud seventy-five ($175) dollars each, respectively, for fourteen, (14,) fourteen and one-half, (14J,) and fifteen, (15,) hand mules.
“ HENRY HOWLAND,

u Captain and, A. Q. M.n

This agreement, amid the circumstances then existing in the Department of the Cumberland, was the most expeditious means that could have been employed by Captain Howland for procuring one thousand mules.
IY. The claimants immediately proceeded to fulfill the terms of this agreement, and on the 1st of April delivered twenty-four mules, at Nashville, for which they were paid in full; and on the 10th of April tendered at Nashville one hundred other mules, in pursuance of the agreement; but the officers of the Quartermaster Department refused to receive these mules, or any more mules, under the agreement, from the claimants, upon the ground that the fall of Richmond and the approaching termination of the war rendered them unnecessary for the use of the army. And the chief quartermaster renounced this and all existing contracts for supplies, and notified all contractors that they must apply to the Quartermaster-General or to the Government for relief. On the 7th or 8th of April the claimants had also shipped two hundred other mules at Lebanon, Ky.,for Nashville, but these were turned back incon-sequence of the refusal of the officers of the Quartermaster Department at Nashville to receive any more mules. At that time the claimants also had purchased and collected, and then held at Harrodsburgh, Ky., and at Lebanon, and on the railroads, about eight hundred and seventy mules, in good serviceable condition, ranging from fourteen to fifteen hands high. This number included the one hundred which were refused at Nashville and the two hundred which were turned back at Lebanon. At the time of the refusal of the Quartermaster Department to receive the claimants’ mules, the price of mules had fallen to $27 and $28 each, and the claimants suffered loss on the eight hundred and seventy mules which they then held to the extent *195 of §108,750, being the difference between the agreed rate and the prices at which the claimants disposed of the mules. On the remaining one hundred and six mules the claimants, if they had been allowed to perform, would have realized a profit of $140 per mule, amounting in the aggregate to $14,840.
The principal question in this case is as to the authority of the quartermaster to enter into the agreement with the claimants, which is the subject of the action, without previous advertisement. In the case of Cobb, Christy & Co., (7 C. Cls. R., p. 470,) the statute regulating such purchases, during the rebellion, received a unanimous construction from this court. The chief difference between this and Cobb,.Christy & Co.’s Case is, that there the chief quartermaster was informed by General Thomas of a specific emergency, and was expressly, though informally, ordered to procure the necessary forage immediately and at all events; while in this case there was only a general knowledge on the part of General Thomas of what his chief quartermaster was doing, and no specific order to procure mules for the movements of his army.
Undoubtedly the Act 4th July, 1864, (13 Stat. L., § 4, p. 394,) contemplates a formal written order from the commanding general to his chief quartermaster, declaring an emergency, and directing the procurement of .the necessary supplies; for it provides, that “ it shall be the duty of such quartermaster to obey such order,”.and that “his accounts of the disbursement of money for such supplies shall be accompanied by the order of the commanding officer as aforesaid, or a certified copy of the same, and also by a statement of the particular facts' and circumstances, with their dates, constituting such emergency;” but the decision of the court in Cobb, Christy cfe Go's Case determines that, so far as the validity of the contract is involved, the order need not be in writing nor of a formal nature. In this case the question is still narrower, and it comes down to the point whether the vendor is by the statute put upon inquiry as to the specific authority of the officer with whom he deals, to be evidenced by the express order of the commanding general.
In several of the earlier cases in this court that question has been answered in the affirmative, it being held that the vendor was put upon that inquiry by the terms of the statute; but those decisions were made before the decision of the Supreme *196 Court in Speed’s Case, (7 C. Cls. R., p. 93,) by which it was determined that where a commissary had contracted without advertisement, as prescribed by the Act March 2, 1861, (12 Stat. L., p. 220,) and no “public exigency” was shown to exist, nevertheless the vendor was not chargeable with knowledge of the fact, but might rely upon the supposition that the commissary was acting within the scope of his statutory authority and upon a knowledge of an exigency not communicated to the vendor.
There is a difference between the two statutes, upon which a very substantial distinction might be placed. The one, (that of 1861,) as construed by the Supreme Court, vests the discretion in the purchasing officer; the other expressly vests it in the commanding general. It is not free from doubt but that a vendor, dealing with a quartermaster is bound to ascertain that the commanding general has exercised this discretion and signified it by proper order.
The majority of the court, however, think this obligation is not imposed upon the contractor. In the first place, the statute does not provide for every subordinate quartermaster being notified of the order. It simply contemplates the order being-issued, in some way, to the chief quartermaster of the department or army, and it is inferable that his subordinates, acting under his authority, are warranted in executing his orders without questioning his. right to give them. In the second place, military exigencies are, in their nature, affairs which are not to be disclosed to all the world, either directly or indirectly. Nothing could be more fatal to the military interests of the Government than that contractors, or the public, or even the subordinate officers of the Quartermaster Department should be informed 11 of the particular facts md circumstances” which constitute the emergency, or of “ the movements and operations of an army” which render the supplies necessary, or of the probable “continuance of such emergency,” or, indeed, of the fact that an emergency exists. Such a communication might well be made by a military commander to his confidential assistant, the chief quartermaster, and might ultimately be used as a voucher in the settlement of the chief quartermaster’s accounts; but that it should be posted about the army and shown to every man who contemplates furnishing the needed supplies, most certainly could never have entered into the intent of the framers of the statute. It was enough for the public and for the contractor *197 to know that the statute had confided to the proper officers of the army that discretionary authority to procure supplies without advertisement; and when supplies were thus sought to be procured during’ the rebellion, the contractor, on the one hand, had no right to demand an inspection of the confidential orders and directions of the commanding general, and, on the other, was not compelled to take the risk of the purchases being made without the requisite authority.
Some question has also been made as to the extent of this emergency, and objection has been raised that the purchase was not immediate. The truth is that military emergencies are things which cannot be measured by formal or precise rules. One may require a dozen mules within the period of a single-day. Another may be of such gigantic proportions as to require them by the thousand, and continue equally imminent over a period of weeks or months. In this case the order was a very large one. There were no mules to be procured literally in the open market at Nashville. The means resorted to by the chief quartermaster constituted as immediate a purchase as the circumstances would admit of. The mules were not bought and delivered in the same hour, for that was impossible, but they were bought deliverable at what appears, by the evidence, to have been the earliest possible time; and the quartermaster was not required, and indeed had not the right, to prolong that time a single day by the formality of a “ previous advertisement.”
The Supreme Court has held that a contractor dealing with the Government is chargeable with notice of all the limitations of authority which the statutes place upon the powers of public officers and agents. But there is a difference between those powers which are expressly defined by statute and those which rest upon the discretion confided by law to an officer or his superiors. The distinction that should be made seems to be that where a statute expressly defines the powers, it is notice to all the world; but where a statute confides a discretion to an officer, a party dealing with him in good faith may assume that the discretion is properly exercised; and if the discretion is vested in a superior officer, while the transaction is with his subordinate, the contractor may assume that the discretion in like manner has been properly exercised, and that the subordi *198 nate is acting in accordance with. Ms superior’s orders and carrying out the exercise of the superior’s discretion.
It is also a ground of defense that the contract, though in writing, was not signed by the contracting parties as required by the Act 2d June, 1802, (12 Stat. L., p. 411.) But the same objection was raised in the case of Cobb, Christy & Co., and after mature deliberation it was thought by the whole court that in these purchases to meet military exigencies neither the statute requiring advertisement, nor the statute requiring written contracts, applied; and, on the contrary, that when a military emergency is to be provided for, the only duty of the quartermaster is to procure the needed article on the most reasonable terms and in the most expeditious way.
There is a further objection taken, that the contract purports upon its face only to be an agreement between the agent and the quartermaster, and not to bind the principals. But the cases of Ramsdell & Smith, in this court, (2 C. Cls. R.,) and of Ford v. Williams, in the Supreme Court,(21 How. B., 287,) authoritatively settle the fact that, though the contract is made by the agent, and though the name of the principal is not disclosed, nor even the fact that the agent is acting for another, still the principal may maintain an action in his own name and give parol evidence of his interest dehors the terms of the written contract.
It is proper to say that only three objections were raised on the trial: 1st, that the contract should be in writing and signed by the parties; 2d, that the claimants were bound to ascertain that an exigency had been declared by the commanding general; 3d, that the claimants were not parties to the contract. As to the contract itself and the construction which should be given it, very little was said upon the argument. We are inclined to think that it is not one of those contracts for the sale of a specific thing, which, upon being renounced by the defendant, entitles the plaintiff to recover all the profits which he might have made$ but that it is one of those in which the plaintiff’s relief is limited by the extent of, his performance at the time of the renunciation. In this case the claimants had performed to the extent of procuring eight hundred and seventy mules. Having tendered one hundred of them, it was unnecessary for them to tender the remainder, and it would have been improper for them to have increased the damages by shipping the remainder *199 to Nashville for the needless purpose of a formal tender. For the damages they have suffered in performing, or being prevented by the defendants from performing, they should recover. For their prospective profits on the remaining one hundred and six mules, which they had not purchased when the contract was renounced, they should not recover.
The average value of the mules held by the claimants, was $167.50; the price at which they were sold was $42.50; the loss which the claimants have sustained is $126.
The judgment of the court is that the claimants recover of the defendants the sum of $108,750.