Nott, J.,
delivered the following opinion :
This case contains four, causes of action, two of which are presented by the claimant and two by the defendants. The facts, briefly stated, are these :
In 1864 the claimant and a quartermaster entered into two contracts, the terms of which, however, are substantially identical. The claimant covenanted to furnish large quantities of hay at certain designated points in the Indian Territory; the defendants covenanted as follows: “It is expressly understood by the contracting parties that sufficient guards and escorts shall be furnished by the G-overnment to protect the contractor while engaged in the fulfilment of this contract.” The claimant delivered a portion of the hay contracted for, and it has been paid for, and is not an element in the present controversy. As to the remainder, he was stopped in the midst of performance, in part by the acts of the public enemy, in part by the orders of the post commander at Fort Gibson, but in all cases for the want of “sufficient guards and escorts.” The accounting-officers of the Treasury treated the covenants above quoted as covenants of indemnity, and adjusted and settled the claimant’s accounts for losses actually suffered, and the claimant accepted and acquiesced in the settlement. ' The subject of profits was not considered in the settlement, for the reason that such unliquidated damages are never adjusted at the Treasury. The claimant now brings his action to recover them exclusively; the defendants deny the validity of the contracts, and file their counter-claims to recover back the allowances made by the accounting-officers as moneys paid in mistake of law.
I. The claimant’s first cause of action is founded on a contract made in June, 1864, which was founded on a quartermaster’s •advertisement for proposals. This advertisement called for the delivery of 3,000 tons of hay at Fort Gibson, and promised the contractor such military protection” “as the necessities and interests of the service may admit.” The contract departed from *526 these terms by dividing the quantity of 3,000 tons into two parcels, one to be delivered at Fort Gibson at $30 per ton, the other seven miles distant at $22; and in covenanting to furnish “sufficient guards and escorts” to protect the contractor ivhile engaged, in the fulfillment of this contract P Because of these discrepancies, it is insisted by the defendants that the contract was void, and that no action can be maintained upon their breach.
As to the first discrepancy: The Act 2d March, 1861, (12 Stat. L., 220, § 10,) though it requires a contracting-officer to advertise, still leaves with him a very large discretion. The time is not prescribed, nor the form, nor the substance of the advertisement; nor is the officer even restricted to accepting the lowest bid. In this the statute differs from other advertisement acts, and notably from the post-office act, which recently received a liberal construction from the Supreme Court. (Garfielde's Case, 11 C. Cls. R., 322.) Dividing the hay into two parcels, deliverable at different places at different prices, was a variation, in the judgment of the contracting-officer, for the benefit of the Government, and fairly within his discretion. Such discretion has been exercised by officers of the Quartermaster Department ever since the first advertisement act was passed. The distinguished officer who has long presided over that Department, and guided its administration with an inflexible and frugal hand, in his well-known communication to General Blair, August 28, 1861, relating to the affairs of General Fremont's department, said — and it was not questioned then and has never been questioned since:
“ Whatever a general commanding orders, the subordinates of his staff are, by regulations, compelled to do, if possible.” “In regard to advertisement and delivery, the law of 1861 and the regulations expressly provide that in case of public exigencies supplies are to be bought in open market as between individuals. Bxercise this power. Moreover, advertisements or public notice does not require postponing opening of bids for a month or a week or two days. If forage, wagons, horses are wanted, the law, the necessity, are fully met by putting a notice in the papers and purchasing as fast as offers come in. The next day or the-same day take the then lowest bid or- the then most advantageous offer. The day. after you will have a *527 still better offer; take that for a portion of your supplies, and so on till you have all you need.”
The second discrepancy between the advertisement and the contract,, or, rather, between the proposals and the contract, forms the foundation and subject of this cause of action. What the claimant sues upon was not offered by the advertisement nor stipulated for by the proposals, but was a subsequent obligation thrust into the formal contract. The thing to be furnished by the contractor remained the same; the price to be paid by the Government remained the same; and then, in addition to the bargain made by the advertisement and proposals, the quartermaster gratuitously gave to the claimant a guarantee or covenant of insurance against war risks, upon which, exclusively, his present demand is founded. As this insurance was not promised by the advertisement, nor required by the proposals, nor given in exchange for anything which had been the subject of negotiation, it seems to us to be an obligation beyond the officer’s discretion, and evasive of that competition which the statute was intended to secure. If the thing promised by the advertisement had been indefinite it would have been proper to render it certain in the contract; but here the advertisement bound the Government to do substantially nothing, and left the war risks of the undertaking entirely with the contractor, while the contract created a new obligation that bound the Government to furnish all needful protection, and transferred to it the risk which constitutes the present cause of action. It is not to be understood that this addition voided the entire contract; it s only this obligation of the defendants that is without legal foundation. The covenants of the claimant, and the consideration which supports them, remain intact.
IL The claimant’s second cause of action rests upon a. contract made without advertisement the 17th July, 1864.
It is objected by the defendants that the order of the commanding officer which gave rise to this contract did not declare an emergency, as was required by the Act 4th July, 1864, (13 Stat. L., 394, § 4.) The construction which I think should be given to that statute I have heretofore expressed in Thompson's Case, (9 C. Cls. R., 187-196,) and subsequent reflection confirms the conclusions which were there reached. They maybe summed up in the following rule: Where a statute expressly defines the powers of an officer or agent, it is notice to all the world; but *528 where a statute confides a discretion, to an officer, a party dealing with him in good faith may assume that the discretion is properly exercised ; and if the discretion is vested in a superior officer, while the transaction is with his subordinate, the contractor may assume in like manner that the discretion has been properly exercised, and that the subordinate is acting in accordance with Ms superior’s orders and carrying out the exercise of his superior’s discretion.
Conceding, however, for the purposes of this decision, that a contractor dealing with a quartermaster during the existence of the act of 1864 was chargeable with knowledge of all the orders by which a commanding officer might seek to provide for military emergencies in the midst of a great war, I am nevertheless of the opinion that in this instance the order sustains the contract.
The statute was passed exclusively for the late war, and was intended to impose upon the discretion vested by law in unnumbered inexperienced assistant and acting assistant quartermasters the discretion of their commanding officer. It did not prescribe formalities. Its purpose was to secure the judgment of a commanding officer as a basis for the action of a quartermaster. In this instance the commanding officer’s judgment was clearly the basis and the only basis of the quartermaster’s action. If the order had never been issued no contract would have ever been made. The order in fact related to two distinct things; it declared an emergency, and directed how the quartermaster should proceed to provide for it. The direction “ should there not be time to advertise and regularly let the contract, you will make the arrangements for the delivery of the hay on the best terms you can,” did not confer discretion to judge whether there was or was not an emergency which would or would not require the designated quantity of hay. It only designated the ways and means by which the quartermaster was to proceed in his part of the work, and to that extent, indeed, limited and lessened the discretion which he might otherwise have exercised.
The fallacy of the defendants’ argument is in this :• that it supposes that a commanding officer must not only declare an emergency, but must also decide that the supplies on hand are insufficient to meet it, and that the procurement of others must be by immediate purchase. I apprehend, on the contrary, that a commanding officer is not chargeable with these responsi *529 bilities, which properly belong to his quartermasters. If he should say to his chief quartermaster, “ This army will begin a retreat in thirty days; have then sufficient teams ready for the movement,” he would have determined all that the law required him to decide. The quartermaster should then ascertain the number of teams which would be required, the number on hand, the deficiency to be provided for, the proportion thereof that could be procured by advertisement, and the balance that must be bought in the market. In the administrative details of providing for the emergency after it had been declared, he was by law invested with all necessary discretion, and those details properly belonged to him and not to his commanding officer. Thus the order of the commanding general in this case merely enjoined the quartermaster to do precisely what it would have been his duty to do without the order, and left nothing to his discretion which the law had not already placed there.
It is also objected that the quartermaster did not proceed in the proper way to meet the emergency, if one was indeed declared. But it is manifest that if the quartermaster was authorized by law to act, this court cannot review the manner in which he acted. Undoubtedly judges upon the bench would make a contract with more deliberation, wisdom, and solemnity than quartermasters in the midst of hostilities; but the statute was made for ordinary men, little learned in the law, and laden with the severest responsibilities that ever tax or distract the mind. It is enough here for us to know that the contracting quartermaster thought this the most immediate method possible for the procurement of the supplies; and it does not rest with courts of law to find a better method after the transaction.
In like manner it is objected that upon the face of the order and contract the contractor was chargeable with knowledge that no emergency in fact existed, and that an agreement made in July to furnish hay through August and September could not possibly be the means for providing for a military emergency. But the emergency contemplated by the statute is not restricted to a march or a battle on the day when the order is given. In this case, when the commanding officer discovered that he would need a large quantity of hay during the ensuing winter in a remote situation where it could not be bought: that the haying season was already far advanced; that implements *530 and hands had to be brought a great distance before the work could begin, he decided, as it was his duty to do, that he had a very serious emergency to provide for; aud it was not a time when a prudent person would have wasted a week or a day in the solemn trifling of advertising for proposals in a region beyond the boundaries of civilization.
This cause of action, then, depends upon the effect which should be given to the covenant promising sufficient guards and escorts; and it may be best understood in the light of the circumstances amid which the contract was made, and the contemporaneous construction which the parties mutually gave to their agreement.
The circumstances were, that the contract was made in the midst of war, and was to be fulfilled on the scene of actual hostilities. The contemporary construction was, on the part of the post commander, that he recognized the risk which had been assumed for the Government, aud forbade the working parties of the contractor going out to make hay without the sufficient escort which it had been agreed should be furnished, but which he deemed it inexpedient to send; on the part of the contractor, that he recognized the right of the commanding officer to control his performance in this particular, and obeyed his commands.
The counsel for the defendants has argued that this covenant was a mere agreement by a military officer, to protect a citizen in the performance of his own business; that it was gratuitous, beyond the powers of military officers, and void. Undoubtedly such an agreement to protect a citizen in the pursuits of his ordinary avocations would be void. But here the covenant in question manifestly was given for a very different purpose.
The contract was in form a contract of sale and delivery, but in substance a contract for work and service. When I employ a man to go upon my land and cut and deliver my hay at so much per ton, the property remains in me, whatever be the form of the agreement, and what I pay for is not his property in the hay, but the labor which he has expended upon it. Here the hay indisputably was to be cut upon the public domain, and the property in it was aud remained in the defendants. But the point need not be discussed, for it was considered in Spencer’s Case, (10 C. Cls. R., 255,) and expressly so decided.
The purpose of the covenant, then, was not to protect a citizen *531 generally in his business, but to protect a contractor in specific work and service which he had agreed to perform for the Government; that is to say, in the fulfillment of a specific obligation into which he had entered at the request of the Government, and from the fulfilment of which the Government expected to reap an advantage. If the defendants’ officers had arbitrarily refused to furnish a guard, clearly the contractor would have been relieved from his obligation to perform. (Porter’s Case, 9 C. Cls. R., 366.) Gan it, then, be held that the covenant was not a moving consideration for the contract, without which the contractor would not have entered into it, or that it is not as obligatory upon the defendants as any obligation which he had assumed on the faith of it ? As was said by the learned counsel who represented the claimant on the first trial of this case,* “There was a war-rislc to be run, and the question when they made the contract was, which party should bear it.” The contract, recognizing the risk, answered that it should be upon the defendants; and the obligation thus assumed was analogous to those numberless charter-parties made during the war, where the Government agreed to assume the war-risks of the vessels which it chartered, though manned and navigated by the owners — agreements the validity of which has never been questioned in the Supreme Court, nor in this.
If this covenant had been simply to furnish a guard, and the commanding officer had furnished one which proved insufficient, it might be held that the defendants had complied with their covenant, and that the risk remained with the contractor. But here they covenanted to do two things: first, to furnish “ guards and escorts ;” second, that those guards and escorts should be “sufficient” to secure “ the fulfillment of this contract.” The agreement, moreover, was construed by the officer who made it as a covenant of indemnity, which would render the defendants liable for all of the contractor’s losses caused by the public enemy; and, to lessen that indemnity as much as possible, the commanding officer interfered positively by forbidding the contractor to proceed with the fulfillment which the defendants had covenanted to protect. That an indemnity against losses may be given to a contractor by the agents of the Government was established by the Supreme Court in Baird’s Case, (8 C. Cls. R., 13.)
*532 III. The defendants’ first counter-claim is to recover back certain payments allowed by the Second Comptroller of the Treasury upon the insurance-clause in the first contract, before referred to; that is to say, the Comptroller deemed the covenant valid which this court now decides to have been invalid, and the counter-claim is to recover back the money paid on his adjustment. It is conceded that the payment was not procured by fraud, nor made in mistake of fact, and that it could not be recovered back by any other party than the Government, and by it only on the ground that its agents are not its agents when they make payments which are not authorized by law. The recent case of McElratlh (ante, p. 201) is regarded as decisive authority upon the point.
Between this case and McElrath’s, however, there is a very broad difference. The Second Comptroller was the agent of the United States to adjust and settle the accounts of officers in the Navy. McEIrath was not an officer in the Navy, nor had he been for any part of the period over which his pretended account extended ; nor had he rendered any service as such; nor hiyi any legal relations between him and the Government existed. The Second Comptroller, therefore, acted ah initio without authority ; and his mistake, whether of law or of fact, that he had jurisdiction of the pretended account gave him none. If in the adjustment of an account which he was authorized to adjust— the account of a veritable officer in the Navy — he had made an incidental mistake of law in allowing to the officer some item of pay which in the judgment of the courts should have been disallowed, and the defendants had brought their cross-action to recover back the over-payment, the case would have been like this.
That settlements made by the accounting-officers of the Government with its creditors, untainted by fraud, and free from mistake of fact, possess the element of finality, I think is clear for many reasons.
1. The Comptrollers of the Treasury are neither contracting nor disbursing officers. Within the proper functions of their offices they are above the review of the highest executive authority, and their decisions are subject to only judicial revision. Substantially all accounts must pass under their eye and receive their approval. Even the accounts of the Secretary of the Treasury and of the President come to them for allowance.' In *533 the case of disbursing-officers the policy of the Government has been to acknowledge no payments as made on its behalf save those which were authorized by law. If an officer makes a mistake of law the payment is disallowed when his accounts come in for settlement, and charged to him as if the money were still in his hands. But the business of the Comptrollers is to determine what payments shall or shall not be made on behalf of the United States. These functions of office were a part of the wondrous birth of the Treasury system, and have remained unchanged from the foundation of the Government to the present time. The only statute which has been passed since the First Comptroller’s office was established is declaratory and mandatory as to their powers. (Act 30th March, 1868, 15 Stat. L., 54.)
2. If the Comptrollers’ settlements have not the ordinary element of finality: if those officers are not the agents of the Government to make final settlements with its creditors, the Government has had the power and the means to take advantage of their errors of law for the last eighty years by going into any court as plaintiff and suing the party to whom money was paid in mistake of law. Y et, from the first day that the Treasury did business until this counter claim was set up, it is safe to say that no such suit was ever brought, and that no man ever supposed that such an action would lie. .A practical construction, going back to the very beginning of the Government, is overwhelming, and cannot be overturned at this late day with safety by anything short of statutory amendment.
3. As no statute of limitations closes inquiry into the past transactions of the Government, all of the settlements which present and past Comptrollers have ever made will be liable to be re-opened. It is well known that the Comptrollers have sometimes construed statutes in one way, and the courts subsequently in another. Such diversity of judgment is inevitable in the administration of human affairs, and the wonder is that there has been so little of it on the part of these officers. The Act 3d March, 1849, (9 Stat. L., 415, § 2,) will furnish one of many illustrations. The Treasury always held that this act extended to vessels in the military service, though navigated by their owners, (Reed’s Case, 4 C. Cls. R., 132;) the Supreme Court has recently held the contrary, (Shato’s Case, ante, p 1.) Can it be possible that all such past transactions are now liable to be reopened; that nothing has ever been settled; that no payment *534 ever made is to be considered final ? Such a ruling caunot promote the public welfare, and, in my judgment, would be prolific in public mischiefs.
4. It is manifest that so broad a rule as is contended for by the defendants would be holding in effect that the accounting-officers of the Treasury are the agents of the Government so long as their mistakes of law are favorable to their principal, but that their agency ceases eo instanti whenever they err incidentally against the Government in the difficult task of construing the statutes of the United States. The result of such a rule would often be that as to one-lialf of a settlement the accounting-officers would be agents and the settlement final; that as to the other half it would be binding upon the creditor if he took the money, but not upon the debtor, and that practically mutuality and finality would be stripped from all Treasury adjustments.
It is not possible, I think, that such a rule can ever be upheld. Certainly the courts have been open to the Govennmeut ever since courts were established, and it has never been supposed that such an action could be maintained. The real question here, I apprehend, is one of agency and not of mistake. When the accounting-officers are authorized by law to adjust an account or settle a claim, the principles of law that would govern the settlements of individuals will govern theirs. The true rule to be laid down, I think, is this: Where the accounting-officers of the Treasury are authorized to settle an account or claim against the Government, a mistake of lato committed incidentally in the adjust-mentioillnot, after payment of the balance found to be due, affeetthe finality of the settlement or entitle the Government to recover back the money paid in mistake of law ex equo et bono.
IY.' The second counter-claim of the defendants is to recover back the money awarded upon the indemnity clause in the second contract, which a majority of the court now hold to have been valid. The only point made which has not been considered is, that part of the amount awarded by the Comptroller was for hay of the claimants destroyed by the public enemy, and that the accounting-officers have not jurisdiction of such damages.
To this objection there are three sufficient answers : 1st. The hay destroyed was not the property of the claimant, but, on the contrary, the property in the hay was always in the defendants, *535 and the contract to furnish hay cut from the public domain was a contract for work and service, as was determined in Spencer’s Case, (10 C. Cls. R., 255.) 2d. The accounting-officers correctly ascribed that effect to the contract, and their award was not for hay destroyed, but for work and services expended by the claimant on that hay of the Government which was destroyed. 3d. The award was based upou the indemnity-clause of the contract, and the loss of the claimant upon this hay was because of the defendants’ breach of that covenant, and the form which the award took was merely for the convenient ascertainment of the damages suffered.
The conclusions which a majority of the court are agreed upon are these:
1. The claimant is not entitled to recover upon the contract of June 20, 1864.
2. The claimant is entitled to recover upon the contract of July 17,1864, the profits which he would have realized if he had been enabled to perform, to wit, the sum of $29,557,
3. The defendants are entitled to recover upon their counterclaim the moneys paid by them to the claimant for hay destroyed, under the contract of June 20,1864, to wit, the sum of $12,600.
4. The defendants are not entitled to recover upon their counter-claim for moneys paid by them to the claimant for hay and property destroyed under the contract of July 17, 1864.
The judgment of the court is, that the claimant recover of the defendants the sum of $16,957.
Loring, J., agreed in all of the conclusions reached by the majority of the court.
Peck, J., agreed in the opinion read by Nott, J., except that he was of the opinion that the claimant should recover upon the contract of June 20,1864, and that the covenant of military protection thereby assured to the claimant was valid and binding upon the defendants; as to which, being absent when the case was decided, he subsequently filed the following reasons:
Because there is not even a pretense of wrong or bad faith in or about the advertisement which preceded that contract, nor in the making of it.
The advertisement promised to any person who should become a contractor “such military protection as the necessities *536 and interests of the service [might] may admit,” reserving to the defendants the exclusive, right to decide what or how much protection would be furnished. The contractor had no power or control over the matter. He might, to be sure, refuse to -execute a contract, unless it stipulated for the furnishing of sufficient protection, (which would have been wise as the result has shown,)-but he could not direct anything in that behalf. The fact of such a notice in the advertisement indicates plainly enough that peril and damage were anticipated.
The officer acting for the defendants might have thought, and probably did think, that the “necessities and interests of the service” would be advanced (and as to this he reserved the right to judge) by promising the protection stated in the contract, and so stipulated. It appears to me quite certain that no responsible party, under the circumstauces, would have contracted without that or some equivalent guarantee. At least, there is not anything to show that any other person offered to do so. All discussion about the advertisement and proposals are out of place, since these were merged in the contract. The claimant had a right to know what military protection, in the opinion of those representing the Government, would be necessary to save its interests, as well as his own, before he should undertake to perform on his part, and if more was gratuitously offered by the defendants than was prudent he could not be expected to decline what was to his advantage. In the transactions and business of life, so far as my observation goes, men are not prone to reject such advantages as are offered them j and few, if any, favors are offered which are not expected to result in some way to the benefit of the proponent.
The defendants, like a minor civil corporation, must transact' business by agents; but whoever thought of annulling a contract made by a civil corporation, because a party contracting with one of his agents, in perfect good faith, accepted a more favorable condition in a concluded contract than it was after-wards thought wise to offer him ?
The question is asked with solemn gravity, Where is the statute which expressly authorizes a quartermaster to agree to furnish protection to a contractor ? .Others may ask with equal gravity, if they have equal courage, Where is the statute that forbids it? If he may contract for the delivery of property costing any number of millions, may he not be supposed to *537 have the power to tlo so on the best terms which would secure the delivery and use of that property to the Government he represents? It should always be presumed that he contracts only for such property as the necessities of the Government demand and cannot be dispensed with. There is, as I believe, a legal principle recognizing’ that the power to contract, or do a particular thing', implies that the person so empowered may do all that is requisite for the success of the object desired. Hence, if an agent may contract for the delivery of an article, he may stipulate for all that is requisite to insure the success of the contract, which might, with as much propriety, be repudiated because he contracted for too great a quantity, as because he contracted for too much protection, when his power or authority to do one is no more restricted than it is to do the other.
The contract of 20th June was known to the superior officers of the quartermaster who made it and not objected to by them, but apparently approved, as is shown by the instructions of General Thayer in reference to the making of the second contract.
At this time and distance from the transaction, and with but little, if any, correct knowledge of the surrounding circumstances or threatening dangers of the occasion, it is alike unjust to the quartermaster and the claimant to scrutinize and pass judgment upon the exercise of a discretion and condemn it which was at the time, and long afterward, approved for its soundness.
The astute and subtle reasoning resorted to to evade obligations, I cannot help thinking, would never have found tolerance, if the present action was between those imaginary veteran litigants, John Doe and Richard Roe, instead of between the Government and a citizen-claimant. I do not choose to strain analogies or coerce authorities to favor either party. My desire is to properly adjust the relative influences of principle and authority with as much precision as is consistent with the character of the subject to be considered, so as to do and promote justice between contestants.
Jurisprudence is supposed to be a rational science, founded upon principles of moral rectitude, modified, it is true, by authority and the habits of mankind, but never failing to do justice equally to all parties, without reference to the power and *538 dignity of either, nor omitting to do so because, on some possible and unforeseen occasions, men may act in an unprecedented manner against their interests without any excuse or pretext for their conduct; like waiting for the sky to fall in order to catch larks.
The idea that the protection promised placed the entire Army of the United States in the leading-strings of the claimant, and therefore rendered the contract void because, by possibility, all the quartermasters, with or without reason or excuse, might do some absurd act, or make some absurd agreement for protecting contractors and thereby dispose of the whole Army, I shall not discuss, but will repeat the language of one of our learned judges, long since pronounced, that “in the construction of contracts words are to be taken in their natural and obvious meaning, unless some good reason be assigned to show that they should be understood in a different.sense.” This is trite law, but not new.

 Mr. E. P. Norton, now deceased.