Richardson, J.,
delivered the opinion of the court :
The claimants prove and rely upon a certificate of the Second Comptroller of the Treasruy, made to the Secretary of War January 6, 1873, certifying a balance of $30,675.68 to be due to them as assignees of Simeon Hart, a Government contractor, for flour delivered by him; a requisition of the Secretary of War upon the Secretary of the Treasruy, requesting him to cause a warrant to be issued thereon for the certified balance; and a warrant by the Assistant Secretary of the Treasury, addressed to the Treasurer, dated January 31,1873, duty countersigned and registered, for the payment of the same, upon which there is a memorandum signed by the Secretary of the Treasury, directing that of the amount $9,000 be paid to the Treasurer, and deposited by him in the Treasury in general account, on account of a debt due the. *299 United States by Simeon Hart, as security on a bond given by Lieut. Gol. John B. Grayson, commissary of subsistence. Upon tbe warrant a draft for $21,675.68 was drawn and issued to claim- ' ants by tbe Treasurer and paid on presentation. Tbe balance of $9,000 was 'deposited in tbe Treasury, according to said direction of tbe Secretary; and it is for tbe recovery of this balance that suit is now brought.
It further appears that tbe certified allowance by tbe accounting officers was made upon an alleged voluntary order, indorsement, or assignment by Simeon Hart of a voucher alleged to have been issued to him by J. B. Grayson, a commissary of subsistence, for flour delivered in May, 1861, under contract, but neither tbe delivery of tbe flour nor tbe genuineness of tbe voucher or assignment thereof was proved in this court, except by what is claimed to be prima facie evidence from tbe documents, of which copies are produced. Thus tbe claimants rely entirely upon tbe certificate of tlie balance found due by tbe Comptroller, tbe requisition of tbe Secretary of War, and tbe warrant of tbe Assistant Secretary of tbe Treasury, claiming that tbe action of the Secretary of tbe Treasury, in directing, by bis memorandum on tbe warrant, a diversion of tbe money from tbe parties to whom it bad been found to be due and its application to another object, was unauthorized, and of no legal effect as against them in this action.
It will contribute to a correct determination of tbe force and effect of tbe acts of tbe public officers thus relied upon to consider carefully bow accounts and claims against tbe Government are settled throughout tbe several processes of settlement, examination, and certification to which they are subjected.
Tbe Revised Statutes (§ 236) require that u all claims and demands whatever by tbe United States or against them, and all accounts whatever in which tbe United States are concerned either as debtors or as creditors, shall be settled and adjusted in tbe Department of tbe Treasury.”
Tbe principal officers to whom this great responsibility is committed bylaw are called “ accounting officers,” consisting of six Auditors (Rev. Stat., § 276), each acting separately upon different classes of accounts, and the Commissioner of tbe General Land Office, who is also an auditor of all public accounts relative to tbe public lands (Rev. Stat., § 456); two Comptrollers (Rev. Stat., § 268), each also acting separately in like manner; andaCommis- *300 sioner of Customs, whose duties were'transferred from the First Comptroller, and who, under another name, is a comptroller in matter of accounts relating to customs (Bev. Stat., §§ 316-318).
There are also other officers through whom accounts must pass for different purposes, in the Treasury Department and elsewhere, before payment is made, whose duties in connection therewith we shall refer to as we note in detail the course of business in settling accounts from the time a demand is brought to the Treasury Department until final payment thereof.
Accounts accruing in the War Department, relating to the pay and clothing of the Army, the subsistence of the officers, bounties and premiums, military and hospital stores, ordnance, recruiting, medical, Freedmen’s Bureau, Soldiers’ Home, and for contingent expenses, are received and examined by the Second Auditor. Those relating to the subsistence of the Army and the Quartermaster’s Department, engineers, river and harbor surveys and improvements, compensation for losses of horses and equipments of officers and enlisted men in the military service, for the losses of horses and equipments or of steamboats and all other means of transportation, in the service of the United States by contract or impressment, and generally all accounts of the War Department other than those provided for, are received and examined by the Third Auditor (Bev. Stat., § 277). When examined, the Auditor certifies in each case the balance, and transmits the account, with the vouchers and certificate, to the Second Comptroller for his decision thereon (Rev. Stat., §§ 273, 277).
The Second Comptroller examines the same and certifies the balance arising thereon, and his certificate is returned, with the vouchers, to the Auditor, who transmits the certificate to the Secretary of War, in whose department the expenditures hare been incurred, for a requisition thereon (Bev. Stat., § 273).
The Secretary of War, upon this certificate, draws a requisition on the Secretary of the Treasury, requesting him to cause a warrant for the amount specified to issue in favor of the claimant, to be charged to .the appropriation to which specific reference is made (Rev. Stat., § 3073).
The requisition, signed by the Secretary of War, is forwarded by him to the Second Comptroller, who countersigns the same (Rev. Stat., § 273), and sends it to the Auditor by whom the account was first audited.
*301 Tlie certificate is returned to the Auditor, who files the same with the Aouchers in his office, records the requisition, certifies to it, and sends it to the Secretary of the Treasury (Rev. Stat., § 283).
A warrant is then draAvn in tlie warrant division of the Secretary’s office and charged to the proper appropriation. The warrant is addressed to the Treasurer of the United States, directing him to pay to the person named tlie amount specified, to be charged to the appropriation named in the margin (ReAr. Stat., §§ 248, 3675). This is examined by one of the Assistant Secretaries (Rev. Stat., § 245), and is signed either by the Secretary, or, in certain cases by special appointment of the Secretary, by one of the assistants (ReA\ Stat., § 246). It then goes to the First Comptoller, who countersigns the same; it being his duty “to countersign all warrants drawn by the Secretary of the Treasury which shall be warranted by law” (Rev. Stat., § 269). It is next sent to the Register, who, after recording and certifying to the same, transmits it to the Treasurer.
The Treasurer thereupon draws a draft, payable by the Treas-lU'e-r in Washington, or elsewhere by an assistant treasurer or designated depositary, to the order of the person named in the warrant, signs the same, transmits it to the Register for record and certification by him, and on its return delivers it to the party to whom it is made payable, or his attorney, or to whom-eArer he may order, unless the Secretary of the Treasury, by a memorandum on the warrant, otherwise directs. The Treasurer relies wholly upon the warrant .as it reaches him under the signature of the Secretary or an Assistant Secretary of the Treasury, and he strictly follows its directions as his authority and justification.
Then, and not till then, is the settlemnet consummated and payment authorized (Rev. Stat., §§ 3593, 3644).'
Accounts of the NaAy Department are settled in the same maimer, except that they go to the Fourth Auditor (Rev. Stat., § 277), and the requisition is draAvn by the Secretary of the Navy (ReA’'. Stat., § 273). So are the accounts relating to Indian affairs and to agents of lead and other mines, except that they go to the Second Auditor, and accounts relating to pensions of the Army, which go to the Third Auditor, and those relating to pensions of the NaAy, which go to the Fourth Auditor (Rev. Stat., § 277), and .all require requisitions from the Secretary of thelnterior instead *302 of other heads of departments (Rev. Stat., § 444); but they are passed upon by. the Second Comptroller, and in all other respects are subject to the same departmental processes as stated with reference to claims on the War Department.
As to the settlement of the accounts of other departments, there is some variation in the course of business from that which we have stated.
, The First Auditor receives and examines all accounts accruing in the Treasury Department; accounts of salaries in the Patent Office; of judges, marshals, clerks, and other officers of courts; of the officer in charge of the public buildings and grounds in the District of Columbia; of the Congressional Printer; of expenditures for the Department of Agriculture; for public buildings and for prisoners convicted by United States courts, and certifies the balances and transmits the same with the vouchers, those relating to the customs to the Commissioner of Customs, and all others to the First Comptroller (Rev. Stat., § 277). The Fifth Auditor receives and examines all accounts relative to the State Department, all accounts of the Commissioner of Internal Bevenue, and those relating to the contingent expenses ofthePatent Office and the Post-Office Department, and accounts of the census, and certifies the balances to the First Comptroller (Rev. Stat., §§ 273, 277).
The Commissioner of the General Land Office also certifies the balances found by him, as an auditor, to the First Comptroller (Rev. Stat., § 450).
The Commissioner of Customs examines the accounts thus transmitted to him, and certifies the balances arising thereon to the Begister, and there his duty ends.
The First Comptroller in like manner certifies the balances arising on the accounts thus transmitted to him directly to the Begister (Rev. Stat., § 209), by whom the accounts, vouchers, and certificates are filed and preserved (Rev. Stat., § 313), and a copy of the certificate in each case sent to the Secretary of the department in -which the expenditure has been incurred (except when it is the Treasury Department), who indorses thereon a request to the Secretary of the Treasury to “please cause a warrant to be issued in accordance with the certified copy of settlement,” and forwards the same to the Secretary of the Treasury, in the warrant division of whose office it is then filed as a basis for drawing a warrant.
*303 When the expenditure has been incurred in the Treasury Department, the Register transmits to the Secretary of tlie Treasury copies of the certificates of balances adjusted (Rev. Stat., § 313), and they are sent to the warrant division, and warrants issue, and other proceedings are had precisely as in accounts which pass the Second Comptroller, as before explained.
There are kept in the warrant division of the office of the Sec-, retary of the Treasury and in the offices of the Register and First Comptroller separate appropriation accounts, in which are credited the amounts appropriated by Congress to each specific object, the Secretary issuing appropriation warrants to the Register and Comptroller therefor. These accounts, in each of those three offices, are charged with all warrants from time to time drawn against them respectively (Rev. Stat., §§ 313, 3675). And the Second, Third, and Fourth Auditors, performing the duties of register for the War, Navy, and the Interior Departments in whole or in part, also keep like appropriation accounts for those departments (Rev. Stat., § 3673). Thus the different officers of the Treasury Department have checks upon each other in the drawing of money from the public funds.
The Post Office Department accounts are kept, audited, controlled, and paid in an anomalous manner, as compared with all other G-overnment accounts. All the revenues deposited in the Treasury on account of that department stand to the credit of the Treasurer of the United States for service of the Post-Office Department, and there is no comptroller of accounts as a separate officer (Rev. Stat., §§ 406, 407, 408, 3642, 3643, 3674). Accounts are examined by the Sixth Auditor, who performs not only the duties ordinarily belonging to an auditor, but also those of a register and a comptroller (Rev. Stat., § 277). When he certifies a balance due, a warrant therefor is drawn on the Treasurer for the amotmt, signed by the Postmaster-General and countersigned by the Sixth Auditor. It is then transmitted to the Treasurer, who records the same, directs, by an order on the face thereof, its payment out of the Treasury, and returns it to the Postmaster-General.
This is not only a warrant, but is a draft also, payable to the order of the creditor, and is delivered to him for collection, and upon that warrant and draft payment is made, the funds of that department not being subject to the warrant of the Secretary of the Treasury, as are other public moneys in the Treasury (Rev. Stat., §§ 3642, 3674).
*304 If tlio Postmaster-General, or any person whose account has been settled by the Sixth Auditor, is dissatisfied with the settlement, he may, within twelve months, appeal to the First Comptroller, whose decision shall be conclusive (Rev. Stat., § 270).
Such is the method of the final settlement- of all accounts in the Treasury, omitting much detail which occurs in carrying on the general course of business.
But vast sums of money are paid to parties for salaries and on other accounts by disbursing officers before the claims have passed the Treasury accounting, and the number of such officers is large, their appointments being provided for by special or general provisions of statute (Rev. Stat., §§ 56-58, 62,176, 255, 496, 1153, 1382, 1550, 1563, 1765, 1951, 3144, 3646, 3648, 3658, 3677,4839, &c.). They are all under bonds, and responsible for the legality and correctness of their payments. Their accounts are finally settled through the accounting officers, and every item charged therein is subject to examination and adjustment, as are all other demands, and only such are allowed as are found to be sufficiently vouched for and to have been legally and rightly paid. All others are rejected, and the disbursing officer and his bondsmen are held liable for any balances found against him on such settlement (Rev. Stat., §§ 3622-3625; McKee v. United States, 12 C. Cls. R., 553).
Most of the accounts of the State Department are paid in that manner, through different disbiu’sing officers and otherwise, before being finally audited, and so are all those of the Department of Agriculture, the Commissioner of Agriculture being himself the disbursing'officer (Rev. Stat., § 3677); and neither he nor the Secretary of State draws requisitions or requests for settlement warrrants to issue on the certified balances of the accounting officers. To these disbursing officers the money is advanced on advance warrants drawn in most cases by requisition or request from the heads of the departments in which the money is required, recognized by statute as to the Secretary of the Senate, the Attorney-General, and Secretary of the Interior (Rev. Stat., §§ 56, 369, 444), and allowed in practice as to all the departments. The money advanced thereon is passed to the credit of the disbursing officers by the Treasurer, the assistant treasurers, or designated depositaries, and drawn by them only on their checks when required and under rules to *305 which they are made subject by department orders and statute provisions, or is received and paid out in cash (Rev. Stat., §§ 3620-3623).
Coupons on bonds and quarterly-interest checks of the public debt are paid on presentation, without advance warrants being-drawn therefor; but the Treasurer is reimbursed monthly by warrants drawn on his requisitions by the Secretary of the Treasury for the amounts thus paid, and subsequently they pass the accounting officer as items of credits in his accounts. But interest on registered bonds (except that on the funded loans, so called, which is paid by checks) is always advanced to the Treasurer and assistant treasurers, upon advance warrants, as in other cases.
Consuls in foreign countries draw drafts upon the Secretary of the Treasury or Secretary of State to the extent of what appears to be due them, and so' do sometimes the ministers of the United States to other governments; although generally the latter officers draw upon the agents or disbursing officers appointed for that and other like purposes in London. These drafts are paid on warrants drawn upon requisitions of the Secretary of State, and are charged to the respective drawers, to be accounted for on final settlement; and the accounts of all these officers are -finally examined and passed upon by the accounting officers, and payments thus advanced are charged against them.
These different processes in the settlement of claims and demands upon the Government from their receipt by the Auditor, through the several stages of examination, certification, and drawing of warrants for payment up to the time when the Treasurer issues Ills drafts, are all matters of accounting, to justify the Treasurer in paying out the public money, and are not consummated beyond recall until the claimants receive the negotiable drafts of that officer, drawn according to the convenience of parties upon the Treasury proper in Washington, or upon one of the several assistant treasurers or designated depositaries in some other place.
Such drafts are understood to constitute new contracts on the part of the Government, into which the previous claims upon which they issue are merged, and are valid and binding upon the United States in the hands of bona-fide holders, by indorsement, for valuable consideration, as commercial bills of exchange *306 and promissory notes are between individuals, whatever valid objections or defenses there may havebeen to the original claims and accounts upon which the settlements were made and drafts issued. (Rev. Stat., § 308; The Floyd Acceptances 7 Wall., 666.)
The certificates and orders made previously to the issuing of the drafts are departmental proceedings, directions among the several public officers, none of which are delivered to the claimants, or even allowed to be seen and examined by them, without leave from some officer having authority to grant it. Parties gain no new rights thereby, into which them former rights of action are merged, and upon which actions can and must be brought as upon an award. There is nothing in the proceedings in the nature of a submission to arbitration.
But if the whole has the semblance of an adjudication and award, the conclusion of it is the amount of money authorized to be paid out of the Treasury to the claimants, for that is the final object of the processes of accounting j and it is the result which arbitrators reach, and not each different step in the processes by which they arrive at the same, taken separately and independently, that determines the rights of parties thereto, if the arbitrators act within the scope of their jurisdiction. And .it may be regarded as settled law, in accordance with the uniform practice, that the accounting officers have jurisdiction, in proper cases, in the coimse of settling accounts in the Treasury Department, to set off one debt against another, when a claimant is both debtor and creditor. (Rev. Stat., § 1766; Gratiot v. United States, 16 Pet., 370.)
In the present case, the Ooimptroller, by his memorandum on the requisition, which was part of his official action in the matter, directed that only $21,675.68 should be paid to the claimants, and the Secretary of the Treasury made a like memorandum upon his warrant, so that they have received all that the public officers finally determined to allow to be paid to them. The Secretary followed the direction of the Comptroller, and did not undertake to alter the determination of that officer or to introduce any new order of his own. If the Comptroller’s determination is conclusive at all, it is conclusive in whole, and not in part, and was so regarded by the Secretary of the Treasury.
In matters of accounting, the several public officers act independently of each other, although the Secretary of the Treasury, being the head of the department, has a right generally to con *307 trol or revise to some extent tbe action of others in subordinate official positions, and a Comptroller bas some power over an Auditor (Rev. Stat., § 271), and is not bound by tbe action of that officer wbicb is certified to him.
For a long series of years, extending from tbe first organization of tbe Treasury Department to 1808, there was a controversy as to bow far, if at all, tbe balances and action of a comptroller were subject to revision and change by tbe beads of departments or tbe President. Upon tbe advice of several Attorneys-General, tbe question was practically settled against tbe right of tbe President and in favor of that of tbe Secretary of tbe Treasury. But tbe Comptrollers yielded with reluctance, and in 1868 an act was passed, wbicb is now incorporated into tbe Revised Statutes as section 191, wbicb provides that tbe balances certified by tbe Comptrollers “ shall be conclusive upon tbe executive branch of tbe Government, and be subject to revision only by Congress or tbe proper courts.” Wé bad occasion, in a former opinion, to review this controversy with care, and it is unnecessary to repeat here what we said then, wbicb may be found in tbe report of tbe case of McKee v. The United States (12 C. Cls. R., 553).
It is provided, as we have seen, that an appeal may be bad from tbe Sixth Auditor to tbe First Comptroller in certain cases, and tbe decision of tbe latter officer is declared to be conclusive. (Rev. Stat., § 270). But this conclusiveness is probably intended to be no more than that of other decisions of tbe Comptroller above referred to (Rev. Stat., § 191); that is, conclusive upon tbe executive branch of tbe Government, but not upon Congress or tbe courts.
Tbe object of tbe Act of 1868 (Rev. Stat., § 191) appears to have been to settle a long-standing controversy, and render tbe Comptrollers independent in their action of tbe beads of departments in certifying balances of accounts, and not to give to tbe decisions of those officers tbe character of awards absolutely binding upon tbe United States. It will be observed that tbe independence of tbe Comptrollers provided for by that act only extends to tbe certified balances, wbicb cannot be changed or modified by other executive officers; but in all other matters of accounting tbe superiority of tbe power of tbe Secretary of tbe Treasury is not modified, but is left as it was before.
In a case decided in tbe Supreme Court, wherein by special *308 act Congress directed tbe Postmaster-General to investigate and adjust certain claims, which he did, and made up his decision or award thereon, and Congress repealed the act before the balance found due was paid, the court held that the proceeding was only a matter of accounting, and that the United. States were not bound thereby as upon an award. In delivering the opinion of the court, Mr. Justice Swayne says: u The adjustment having been made under a special law renders it in nowise different as regards the point we are considering from those made daily by the accounting officers of the Government under the general law conferring their powers and prescribing their duties. The idea that the Government is finally concluded by the result at which they may arrive would be regarded as a novelty within and without the several departments.” (Chorpenning v. United States, 94 U. S. R., 397, and 12 C. Cls. R., 119.)
The claimants’ counsel relies upon the case of Kaufman v. United States (11 C. Cls. R., 659), recently affirmed on appeal by the Supreme Court (9G U. S. E., 5G7), wherein it was held that an action might be maintained in this court upon an allowance made and certified by the Commissioner of Internal Eevenue for the refund of a tax paid by a special tax stamp returned under the provisions of Eevised Statutes, § 342G. But that was quite a different case from this. The Commissioner of Internal Eevenue is not an accounting officer, and his allowance of a refund was made necessaiy by the statute and regulations before the claimant in that case had any cause of action upon which to found proceedings in this court. The original claim belonged to one of several classes of claims of like character, as.to which the claimants’ rights and liability of the United States are not fixed until the discretion of some designated officer has been exercised thereon and an allowance ordered by him. The rules of law apxilicable to our jurisdiction in such cases have been carefully considered and laid down by this court in former cases. (Campbell v. United States, 12 C. Cls. R., 470; Boughton v. Same, 12 id., 330.) Claims of that kind arise under numerous provisions of law, among which may be mentioned refunds of customs duties improperly collected, &c. (Rev. Stat., §§ 2984, 3011, 3014; Nichols’s Case, 7 Wall., 122); drawbacks for duties and internal-revenue taxes paid under various circumstances entitling parties to refund on the conditions specifically provided for (Rev. Stat., §§ 2977, 3015-3057, 3386, 3441; Portland Co. v. United States, *309 5 C. Cls. R., 441; Campbell v. United States, 12 id., 470); refunds of internal-revenue taxes wrongfully assessed and collected or abated for different causes (Rev. Stat., §§ 3220, 3221, 3228); and claims for cotton seized after June 30, 1865, by agents of tie Government in violation of tieir instructions (Act of May 18, 1872, 17 Stat. L., 134). In all tiese cases, and others of ike kind, the officer charged by statute with the duty of allowing or disaiowing the claim in his discretion or according to his judgment, must first act before the claimant’s right is fixed. Then, when he has obtained a decision in his favor, the claimant’s demand, of which that decision is a prima-facie, if not conclusive, determination, if the officer acts within the scope of his authority and in accordance with the provisions of law, may be the foundation of an action in this court, or may pass the accounting officers and be paid by drafts upon warrants, duly issued, as in other cases.
Even the judgments of the Court of Claims must pass through the same processes of accounting, not for the purpose of review, but to justify the Treasurer in issuing his draft for the payment thereof; and that is what all the long process of accounting leads to, as we have before pointed out.
It remains to be considered whether or not the decisions of the accounting officers in favor of claimants, if not conclusive on the United States, are not at least prima-facie evidence of indebtedness, with the burden of proof on the defendants to impeach and overthrow the same. Most of the circumstances and reasons which we have recited as showing that such decisions are not conclusive on the court, also show that they are not even prima-facie evidence. ■
The functions of this court are to hear and determine original claims and demands against the United States founded on contract, statute, or departmental regulations, and not upon the reports and action of accounting officers made for purposes altogether different from that of submission to any court. By Be-vised Statutes, section 1063, the head of any department may transmit any claim made upon it to the Court of Claims for determination, and it has been held that this may be done after the accounting officers have certified a balance in favor of the claimant. • (Delaware River & Steamboat Co. Case, 5 C. Cls. R., 55; Winnisimmet and other cases, 12 id., 319.) It never could have been intended by Congress that in such cases the United States were to assume the burden of proof to establish the errors of *310 tbeir accounting officers, instead of requiring claimants to prove tbeir whole case.
It is clear, from all tbe provisions of law applicable to this court, that claimants are required to establish their rights by-original and legal evidence, exclusive of the testimony of parties in their own favor (Rev. Stat., § 1079), and that they are not to rely upon reports and certificates of officers who pass upon claims without the formality of such evidence and proofs as aré quired in courts of justice; certificates made upon ex-parte affidavits, often of claimants and interested parties; documents not proved under oath and reports of other officers not sworn to,, and other evidence satisfactory to them, and which, under all the circumstances, may be trustworthy to a greater or less extent, as is the unsworn and hearsay evidence on which most or the business of daily life outside of courts is conducted, but which would be wholly incompetent here.
The statements of accounts upon such evidence by accounting officers who have no other knowledge of the facts would be an unsatisfactory foundation on which to rest a prima-facie case against the United States, when parties come into court to set up and enforce their legal rights.
One of the primary, most important, and most useful objects-to be attained in establishing this court was to provide a tribunal where claims against the Government should be determined upon legal evidence, taken under the forms and subject to the rules of law, which they are not and never can be in the process, of accounting in the Treasury Department, the machinery of which is only adapted to the passing upon ordinary accounts upon which controversies are not expected to arise to any great extent, and not at all beyond the means of adjusting from the. records and files of the several departments.
By Bevised Statutes, section 886, a transcript of the books and proceedings of the Treasury Department is made evidence “ when suit is brought in any case of delinquency of a revenue officer or other person accountable for public money,” and certified copies are authorized to be received, instead of compelling, the Government to produce original documents in certain cases.. And by Bevised Statutes, sections 951 and 952, in suits by the United States against individuals, “no claim for a credit shall be admitted upon trial except such as appear to have been presented to the accounting officers of the Treasury for their ex- *311 animation, and to bare been by them disallowed in whole or in part,” with an exception therein specified but not here material. Those provisions relate to actions brought by the United States, and are rules of evidence established for the convenience of the G-overnment as exceptions in its favor" to the general rules of law, and are not apx>licabe to proceedings in this court in favor of claimants.
There is a reason why a transcript of the records and proceedings of the Treasury Department may justly and properly be made evidence by Congress in favor of the United States “ in any case of delinquency of a revenue officer or other person accountable for public money,” to which this provision is limited, which does not apply in cases brought by claimants to establish their demands. In the former case, the items and charges to be proved thereby are payments and advances made through the departments by public officers, whose duty it is to enter the same of record. They are official recorded acts, authenticated, as other records are, by certified copies. In the latter case, the items which claimants set up as demands against the government are not generally matters of record nor within the knowledge of the Treasury officials, and whatever vouchers appear among the papers in the course of the proceedings for accounting are usually furnished by the claimants; and the filing of them in the department and then obtaining a transcript of the same, if such transcript were admitted in evidence, would be to claimants an easy method of making evidence for themselves.
Even when offered in favor of the United States, a transcript from the Treasury Department is not evidence of all it may contain. In United States v. Bufort (3 Pet., 12), the Supreme Court says, “An account stated at the Treasury Department, which does not arise in the ordinary mode Of doing business in that department, can derive no additional validity from being certified under the act of Congress. Such a statement can only be regarded as establishing items for moneys disbursed through the ordinary channels of the department, where the transactions are shown by the books.” In several subsequent cases this statement is cited by the court with approval.
"We do not mean to hold that a copy of a voucher sent here officially through the department in which it belongs, and where the original is recognized as genuine and valid, would not be jprima-faeie evidence of indebtedness, independently of the ac *312 tion of the accounting officers; but only tliat accounts and balances stated by those officers, involving controverted questions of law as well as of fact, depending upon the genuineness, validity, and legal effect of documents, as the assignment of the voucher in this case, which are not matters of public record, nor within the knowledge of officers of the department in which they are filed, and are accepted upon evidence which would not be admitted in any court of justice, are not prima-facie evidence to charge the United States in suits against the Government.
The Court of Claims at first had a rule that “in every case where the claim is such as is ordinarily settled in any executive department, the petition shall show that application for its allowance has been made to that department, and without success, and its decision thereon”; and a petition was dismissed because it did not set forth those facts. On appeal, the Supreme Court decided the rule to be unauthorized and void, and remitted the case, with directions to proceed to a hearing on the petition, and the rule was thereupon abrogated, and this court has ever since proceeded to hear cases without reference to the action of accounting officers thereon. (Clyde v. United States, 13 Wall., 35.)
If, however, it is the duty of the Court of Claims to revise the certificates of the accounting officers as prima-facie evidence in favor of the claimants, and to confine itself to a review of the case upon the papers submitted through those public officers, we find in this case two insurmountable obstacles in way of a recovery by the claimants.
1. The original cause of action first accrued in May, 1861, and the petition was not filed until July, 1877, more than six years after the cause of action first accrued, and so is expressly barred by statute (Eev. Stat., § 1069), unless the allowance by the accounting officers created a new cause of action, which we have shown was not the legal effect thereof.
2. The present claimants are assignees, or claim to be assignees, of the original creditor of the United States, by virtue of a voluntary assignment made before “the allowance of the claim, the ascertainment of the amount due, and the issuing of the warrant for the payment thereof.” It has recently been authoritatively determined by the Supreme Court that such an assignment is in direct contravention of the act of 1853, chapter 81 (now Rev. Stat., § 3477), and gives to the assignee no right of action against the United States. Neither the accounting offi *313 cers nor tbe Secretary of the Treasury, nor both together, can create a privity of contract between the Government and an as-signee of its creditor, by recognizing a voluntary assignment made before the warrant for payment is drawn, and by stating an account thereon in favor of the assignee. (Gillis’s Case, 95 U. S. R., 407; Burke’s Case, ante; Johnston’s Case, ante.)
So, in any point of view which we consider this case, it is clear that the claimants have no legal cause of action upon the facts which have been proved.
This brings us to the question of whether or not the defendants are entitled to judgment against the claimants for the $21,675.68 thus paid to them as assignees, by virtue of an assignment made before warrant issued. The Assistant Attorney-General has filed a set-off or counter-claim (Rev. Stat., §§ 1059, 1061) for that amount, on the ground that payment was illegally and improperly made by the public officers, and so may be recovered back.
In our opinion, this position cannot be successfully maintained. It by no means follows that payments made with the consent of the parties interested, upon assignments which could not be enforced in law, are such illegal and unwarranted payments by public officers that the United States may recover back the money, especially when the settlement is not objected to, but is acquiesced in by the original creditor, and it does not appear that the Government has suffered or can suffer any loss thereby.
If parties allow money due them to be paid to others with their knowledge and consent, it is an adoption and ratification of the act which they cannot afterward set aside, and such payment is a valid discharge of the debt as between the Government and the creditor. There is no reason, therefore, why the United States shoul recover back what has thus been paid in good faith and to the satisfaction of all parties interested, when there is no other clamant for the money which, if recovered, the Government ought not to retain.
On the whole case, the judgment of the court is that both the claimants’ petition and the defendants’ counter-claim be dismissed.