## LAMBERT LUMBER CO. v. JONES ENGINEERING & CONSTRUCTION CO., Inc., et al. *

### No. 8875.

Circuit Court of Appeals, Eighth Circuit.

Feb. 2, 1931.

*Certiorari denied 51 S. Ct. 489, 75 L. Ed. —.

Harris L. Moore, of Kansas City, Mo. (John W. Moore and W. C. Michaels, both of Kansas City, Mo., on the brief), for appellant.

David A. Murphy, of Kansas City, Mo. (John T. Harding and R. Carter Tucker, both of Kansas City, Mo., on the brief), for appellees.

Before KENYON and GARDNER, Circuit Judges, and MUNGER, District Judge.

KENYON, Circuit Judge.

Appellant furnished material to the Jones Engineering & Construction Company to be used in the performance of a contract for the construction of a government hospital at Excelsior Springs, Mo. It sought on March 15, 1926, to intervene in an action brought by another contractor under section 270, title 40, chapter 3, USCA, against the Jones Engineering & Construction Company and the sureties on its bond.

A jury was waived in writing. The trial court held that the intervention was not in time, as it was attempted over a year after the work was performed and final settlement made between the government and the contractor, and dismissed intervener's petition.

Findings of fact were made by the court, i. e., that the bond contemplated under section 270 (40 USCA) was duly given; that intervener furnished the materials to the contractor, as claimed, and is entitled to recover, if its intervention was in time; that an original contract and a supplemental contract had been entered into; that suit was originally filed upon the bond by another company, which was dismissed but afterwards reinstated to permit intervention; that the work undertaken by the contractor was completed more than one year before intervention; that material had been furnished by intervener both for the original contract and the supplemental contract; but that it was unnecessary to separate the liability of the several sureties. We quote certain of the findings:

"5. The contract in question specifically provided that:

" 'The work * * * shall be done under the jurisdiction and control of the Chief of the Bureau of Yards and Docks, Navy Department, or such representative as he may designate.'

"Relative to payment under the contract, it was provided that the contractor 'shall be paid, * * * upon vouchers prepared and certified by the Bureau of Yards and Docks, Navy Department, and approved by the Director, U. S. Veterans' Bureau.'

"7. In the matter of final settlement the evidence showed and the Court finds that on February 20, 1925, the Government procured a release from the contractor which contained the following recitals:

" 'Whereas, by provisions of the contract dated September 20, 1923, by and between Jones Engineering and Construction Company, Inc., a corporation of the State of Nebraska, party of the first part, and the United States, a party of the second part, for the construction of a ward and subsistence building, at the U. S. Veterans' Hospital, Excelsior Springs, Missouri, it is contemplated that final settlement therefor shall not be made until the party of the first part shall have executed and delivered a final release of all claims or demands growing out of the contract; and

" 'Whereas all the conditions, covenants and provisions of the said contract as modified have been performed and fulfilled by and on the part of the party of the first part;

" 'Now, therefore, in consideration of the premises and of the sum of ten thousand nine hundred seventy-five and 39/100 ($10975.39) dollars, lawful money of the United States, being the full and entire sum due upon the completion of the work, as aforesaid, to the said party of the first part in hand paid by the said party of the second part, the receipt of which is hereby acknowledged, the said party of the first part does hereby remise, release, and forever discharge the said party of the second part of and from any and all

manner of actions, suits, debts, dues, sums and sums of money, accounts, reckonings, bonds, bills, covenants, controversies, agreements, promises, claims, and demands whatsoever in law or in equity that the said party of the first part has or may have for or on account of or in connection with the contract aforesaid, as modified by Changes A and B and Supplemental Agreement.' "

"8. This release was the culmination of correspondence between the proper department of the Government and the contractor. Under the contract, the work should have been completed on or before September 3, 1924. It was actually completed September 20, 1924. Because of this delay of seventeen days the Government deducted for liquidated damages $50.00 a day or a total of $850.00 from the contract price. After such deduction was made a balance of $10,975.39 was determined. A voucher for said sum was approved by each and every department interested in the construction, as provided by the contract, on the day the release was executed, to-wit, February 20, 1925, save the approval of L. E. Gregory, Chief of the Bureau of Yards and Docks, was noted upon the voucher as of March 2, 1925."

"10. After this was done, the voucher was sent to the general accounting office of the Government, accompanied by the following letter:

"United States Veterans' Bureau
Claim

Reference to

General Accounting Office

Treasury Division.

—— 19—

"Examined in the sum of $10,975.39 and respectfully referred to the General Accounting Office for examination, settlement and approve for payment in the amount found due to Jones Engineering & Construction Co., Inc., c/o Chief, Bureau Yds. & Docks, Navy Dept. Washington, D. C. from the appropriations stated below:

" 'Hospital Facilities & Services, Veterans' Bureau'

"Letter dated May 22, 1924, extended the contract time 23 calendar days because of abnormal weather conditions. In view of recent suspensions, because time extensions were given for similar reasons, the voucher is forwarded for direct settlement.

"Frank T. Hines, Director."

"11. On April 2, 1925, the Comptroller General of the general accounting office certified that he had 'examined and settled the claim of Jones Engineering and Construction Company for final payment.'

"If the settlement was made on April 2, 1925, as certified by the Comptroller General of the general accounting office, then the intervener is entitled to recover because its claim was filed by its intervention on March 15, 1926, which was less than one year after final settlement. If the final settlement was made on March 2, 1925, the date on which the voucher in final settlement was approved by the departmental representatives mentioned in the contract, then intervener is not entitled to recover because its intervention was more than one year after final settlement."

"12. The Court finds that final settlement occurred prior to March 15, 1925, and that the intervention herein was filed more than one year after the date of final settlement and that therefore intervener cannot recover."

The trial court filed an opinion pointing out that the only question was the time of final settlement, and stated that the litigants were in agreement that "a 'final settlement' is when the government finally determines according to administrative methods what amount it is willing to pay to the contractor." It relied on Illinois Surety Co. v. Peeler, 240 U. S. 214, 36 S. Ct. 321, 324, 60 L. Ed. 609, in its holding that " 'the appropriate administrative determination with respect to the amount due' was committed to the Bureau of Yards and Docks, Navy Department and the Director of the U. S. Veterans' Bureau." It took the position that the Comptroller General was not in a position to ascertain the amount actually due under the contract, and that it was not "a part of his administrative function."

Two reasons seem to be controlling in the court's decision: First, that there was no authority in the General Accounting Office, represented by the Comptroller General, to make a final settlement within the meaning of section 270, title 40 USCA; and, second, that the appropriate administrative determination as to the amount due was in the Bureau of Yards and Docks of the Navy Department and the Director of the Veterans' Bureau.

Section 270, title 40, USCA, reads substantially the same as the Act of February 24, 1905, c. 778, 33 Stat. 811, which amends the

Act of August 13, 1894, c. 280, 28 Stat. 278, the only change being the substitution of the words "District Court" in section 270 for Circuit Court, as appeared in the Act of February 24, 1905. Section 270 contains this proviso:

"Provided, That where suit is instituted by any of such creditors on the bond of the contractor it shall not be commenced until after the complete performance of said contract and final settlement thereof, and shall be commenced within one year after the performance and final settlement of said contract, and not later."

There is no controversy on the proposition that a complete performance of the contract had taken place more than a year before intervention was sought, so that question is eliminated from the case.

The only question here is, When was final settlement made as that term is used in said section? If made prior to March 15, 1925, then the intervention is barred. If made on April 2, 1925, as claimed by appellant, then the intervention is not barred.

At the threshold of the case, we are met with a question raised by appellees that, in view of a jury being waived in writing, the finding of the trial court "that final settlement occurred prior to March 15, 1925 and that the intervention herein was filed more than one year after the date of final settlement and that therefore intervener cannot recover," is a finding of fact, that of necessity it supports the judgment, no evidence being before this court, and hence that there is nothing for this court to determine.

The procedure of waiver of jury in writing is under section 773 and section 875 of 28 USCA. Section 773 provides that, where a jury is waived in writing, "the finding of the court upon the facts, which may be either general or special, shall have the same effect as the verdict of a jury," and section 875 provides that, "when the finding is special the review may extend to the determination of the sufficiency of the facts found to support the judgment."

In finding 12 the court said: "The Court finds that final settlement occurred prior to March 15, 1925."

Appellees contend that this is a finding of fact. We think not. The trial court had made a number of specific findings of fact and drew its conclusion as to settlement from these findings. The court in effect states that from the findings of fact the conclusion follows that final settlement occurred prior to March 15, 1925. This seems to us to be clearly a conclusion of law. That a conclusion of law may be placed in the category of findings of fact does not change the character of the conclusion, and make it something that it is not. In Insurance Co. v. International Trust Co., 71 F. 88, this court called attention to the fact that ofttimes the trial court stating ultimate propositions of fact in the form of special findings might be compelled to embody in the findings some legal inferences as well as inferences of fact, and that seems to be the situation here. These special findings of fact of the trial court have the same effect as the verdict of a jury. The question is properly before us as a question of law whether they sustain the judgment. Anglo-American Land, M. & A. Co. v. Lombard (U. C. A.) 132 F. 721; Webb v. National Bank of Republic (C. C. A.) 146 F. 717; Chicago, R. I. & P. Ry. Co. v. Barrett et al. (C. C. A.) 190 F. 118; Guaranty Trust Co. of New York v. Koehler (C. C. A.) 195 F. 669; United States v. United States Fidelity & Guaranty Co., 236 U. S. 512, 35 S. Ct. 298, 59 L. Ed. 696.

We are not unmindful that in Fleischmann Construction Co. v. United States, 270 U. S. 349, 46 S. Ct. 284, 70 L. Ed. 624, the Supreme Court held the declarations in a petition that a contract was completed and final settlement had at a certain date were not mere conclusions of law, but specific averments of an ultimate fact. These were statements in a pleading, and might as to a pleading be regarded as statements of fact. Here specific findings of fact were made upon which was based the conclusion as to the time when final settlement occurred. We cannot believe that under these conditions the conclusion of the trial court "that final settlement occurred prior to March 15, 1925," would be held by the Supreme Court to be otherwise than one of law.

This brings us to the controlling and difficult question of this case, namely, When was the final settlement made between the government and the contractor?

Appellant's theory is that it was made in the General Accounting Office by the Comptroller General on April 2, 1925, and hence that the intervention was within the year under section 270, title 40, USCA.

The theory of appellees is that the action of the Bureau of Yards and Docks of the Navy Department approved by the Director of the United States Veterans' Bureau in

securing the release of February 20, 1925, from the contractor, the making of a voucher for the sum found due, its approval by the departments interested in the construction, was an administrative determination of the amount due the construction company, and that the sending of the voucher to the General Accounting Office with the letter of the Director of the Veterans' Bureau had nothing to do with the final settlement.

It is interesting to note that the trial court, the appellant, and the appellees rely on the case of Illinois Surety Company v. Peeler (hereinafter referred to as the Peeler Case) 240 U. S. 214, 36 S. Ct. 321, 60 L. Ed. 609.

Cutting to the bone of this controversy, we think the real question is whether under the facts of this particular case there was power in the General Accounting Office, acting through the Comptroller General, to make a final settlement, as the term is used in section 270, title 40, USCA of the contractor's claim. The broader question whether any final settlement of a claim or demand against the government, except where there is specific authority from the Congress, can now, in view of the Act of June 10, 1921, be settled and adjusted except in the General Accounting Office, is not necessary to be determined. That question, somewhat doubtful, in view of the numerous decisions which have attempted to follow the Peeler Case, will undoubtedly in due time be presented to the Supreme Court in a case where it is squarely raised. Our discussion of the authority of the Comptroller General must of necessity include some references thereto.

The Bureau of Yards and Docks and the Veterans' Bureau certainly did not intend to make a final settlement when the release from the contractor was executed and a voucher was prepared. Some question had arisen concerning liquidated damages. Also it appears from the letter from the Veterans' Bureau to the General Accounting Office that there had been an extension of time under the contract because of weather conditions, and that, as there had been recent suspensions evidently by the Comptroller General for similar reasons, the Veterans' Bureau was not willing to take any chances thereon, and so forwarded the voucher "for direct settlement." If it had been intended that the action of the Veterans' Bureau and the Bureau of Yards and Docks of the Navy Department should be a final settlement, there would have been no need of any such a letter as is set forth in finding 10. It would merely have asked for approval of the voucher. This letter is entitled:

"United States Veterans' Bureau
Claim

Reference to

General Accounting Office

Treasury Division."

It practically states that this claim has been "examined" and is now referred to the General Accounting Office for "Examination, settlement and approve for payment in the amount found due." This letter does not use the term "determined" or "administratively determined," but uses the term "examined." Administrative examination of accounts, as distinguished from administrative determination, is recognized in the act. Section 82, title 31, USCA. It is as apparent as words can make it that the voucher was not sent to the General Accounting Office by the Director of the Veterans' Bureau simply to be approved for payment. It was sent after it had been "examined in the sum of $10,975.-39," for "examination, settlement and approve for payment," and on April 2, 1925, the Comptroller General certified he had examined and settled the claim of the Jones Engineering & Construction Company for final payment. He did not merely state that the voucher was approved.

If the Veterans' Bureau and the Navy Department had intended their action to be a final settlement, and if a disbursing officer of the Veterans' Bureau had taken chances as to a future controversy over the matter with the Comptroller General, and had paid this claim, a different question would have arisen. Even though there were no intention of the Chief of the Bureau of Yards and Docks of the Navy Department or of the Director of the Veterans' Bureau that the release should constitute a final settlement, is a court nevertheless, because of certain decisions of the courts, to say it is a final settlement, and that the General Accounting Office had no power to settle the claim, although such power is clearly given it by section 71, c. 2, title 31, USCA, reading as follows: "All claims and demands whatever by the Government of the United States or against it, and all accounts whatever in which the Government of the United States is concerned, either as debtor or creditor, shall be settled and adjusted in the General Accounting Office"?

Great power has been conferred by Congress on the General Accounting Office and the Comptroller General. The General Ac-

counting Office is the result of the development of accounting procedure during the life of the nation.

A reference to the attempts of the government since its very foundation to maintain close supervision over the expenditures of public money and to establish some system whereby those making contracts for the government should not have the responsibility for their settlement may not be amiss. Under article 1, section 9, of the Constitution, no money can be drawn from the Treasury except by an appropriation made by Congress. No contract can be made on behalf of the United States, "unless the same is authorized by law or is under an appropriation adequate to its fulfillment, except," etc. Section 3732 Rev. St. (41 USCA § 11). Any officer of the Government making a contract "for the erection, repair, or furnishing of any public building," and agreeing "to pay a larger amount than the specific sum appropriated for such purpose," is guilty of a criminal offense. 35 Stat. p. 1106, § 98 (18 USCA § 184). While the various administrative officers in the governmental departments have authority generally to enter into contracts on behalf of the United States where no limitation thereon may exist by law, it does not follow that they have the authority always to make settlements of these contracts or adjustments of matters arising thereunder.

In the act establishing the Treasury Department (Act Sept. 2, 1789, 1 Stat. p. 65, c. 12), a Comptroller was provided for, whose duties were to attend to the adjustment and preservation of the public accounts and to examine all accounts settled by the auditor. The accounting system first designed by Alexander Hamilton was set up in the early days of the Republic in the Treasury Department, and has been modified at various times by acts of Congress, one of the most important of which was the provision in the Act of March 3, 1817 (3 Stat. p. 366, c. 45, § 2), as follows:

"That, from and after the said third day of March next, all claims and demands whatever, by the United States or against them, and all accounts whatever, in which the United States are concerned, either as debtors or as creditors, shall be settled and adjusted in the Treasury Department."

Again the system was modified by the Act of July 31, 1894 (28 Stat. p. 210, c. 174, § 14 thereof), which provided:

"In the case of claims presented to an Auditor which have not had an administrative examination, the Auditor shall cause them to be examined by two of his subordinates independently of each other."

This general accounting system provided by statute, with the accounting officers thereof having the right to pass upon and determine accounts, was in the Treasury Department when the Peeler Case, supra, was determined, and it remained there until the Act of June 10, 1921, known as the Budget and Accounting Act. 42 Stat. p. 20, chap. 18, title 31, § 1, USCA et sequitur.

A clear statement of the method of settlement of accounts by the various auditors of the different departments of the Treasury Department is set forth in McKnight v. United States, 13 Ct. Cl. 292, and the growth of the system is also pointed out clearly by Justice Hughes in the Peeler Case.

In the annual report of Postmaster General Kendall in 1835, it was urged that Congress establish independent audits and settlements of the transactions of his department. He said:

"There is another feature in which the present organization of the Post Office Department is defective and unsafe. It is believed to be a sound principle, that public officers who have an agency in originating accounts, should have none in their settlement. The War and Navy Departments are in general organized upon this principle. In the orders, contracts and regulations of the heads of those departments, or their ministerial subordinates, issued and made in conformity with law, accounts originate; the moneys are generally paid by another set of agents but partially dependent on the heads of the departments; and the accounts are finally settled by a third set who are wholly independent of them. If from any cause, an illegal expenditure be directed by the head of a department, it is the duty of the disbursing agent not to pay the money; and if he does pay it, it is the duty of the Auditors and Comptrollers to reject the item in the settlement of his account. But the Postmaster General practically unites these three functions in his own person. He issues orders and makes contracts and regulations producing the expenditure of money, settles the accounts and pays the money. Although he is required to render a quarterly account to the Treasury, to be settled as other public accounts are, this requisition has long ceased to constitute any practical check upon him, nor can it ever be otherwise under the existing system."

The separate audit of the transactions of the Post Office Department was provided for in the Act of July 2, 1836 (5 Stat. p. 80, c. 270).

Little question was raised in the early days as to the accounting officers of the Treasury Department having authority to settle claims against the United States, and, prior to the establishment of the Court of Claims in 1863, the only appeal from their settlement was to Congress. To settle any dispute that might arise over the authority of heads of some of the departments, Congress on March 30, 1868, passed an act providing that balances certified to the heads of departments by the Comptroller of the Treasury, "when stated by the auditor and properly certified by the comptroller * * * shall be taken and considered as final and conclusive upon the executive branch of the government, and be subject to revision only by Congress or the proper courts." 15 Stat. c. 36, p. 54.

When in 1868 the Secretary of War recommended the modification of this act, the House Committee on Revision of Laws reported against it.

In Cooke et al. v. United States, 91 U. S. 389, 399–400, 23 L. Ed. 237, the Supreme Court said, referring to 1 Stat. 65: "Thus it is seen that all claims against the United States are to be settled and adjusted 'in the Treasury Department;' and that is located 'at the seat of government.' The assistant treasurer in New York is a custodian of the public money, which he may pay out or transfer upon the order of the proper department or officer; but he has no authority to settle and adjust, that is to say, to determine upon the validity of, any claim against the government. He can pay only after the adjustment has been made 'in the Treasury Department,' and then upon drafts drawn for that purpose by the treasurer."

In St. Louis, Brownsville & Mexico Railway Co. v. United States, 268 U. S. 169, 174, 45 S. Ct. 472, 473, 69 L. Ed. 899, the court said: "Payment for transportation, as for other service or supplies, may ordinarily be secured by presenting the claim to the appropriate disbursing office of the department served. Because of limitations imposed upon the powers of disbursing officers, it is often desirable to present the claim for direct settlement to the Auditor for the department, who is an accounting officer of the Treasury. The Auditor may allow the claim in whole or in part. If his action is not satisfactory, either to the claimant or to the head of the department affected, an appeal may be taken to the Comptroller of the Treasury for its revision. In the absence of an appeal, the settlement of the Auditor is 'final and conclusive upon the executive branch of the government.' In case of such appeal the decision of the Comptroller is conclusive. Any person accepting payment under a settlement by the Auditor is precluded from obtaining such revision of the settlement as to any item upon which payment is accepted. Dockery Act July 31, 1894, c. 174, §§ 7, 8, 28 Stat. 162, 206, 207 (Comp. St. §§ 420, 425, 703). No action of these officials can bar the right of a claimant to have the Court of Claims determine whether he is entitled to recover under a contract with the government."

From these statutes and decisions it would seem clear that, prior to the Budget and Accounting Act of 1921, there was ample authority in the accounting officers of the Treasury Department to make final settlement of accounts for and against the United States. Even with this accounting system in the Treasury Department passing on claims and determining amounts due from the government, the waste of public money and the scandals arising from payments on government contracts had so challenged the attention of Congress and the country that there was agitation for the creation of a budget system and to put a stronger check on governmental expenditures by a strengthening of the accounting system.

There was introduced in the Sixty-Sixth Congress a bill known as the Budget Bill (H. R. 9783), upon which there were extended hearings. This bill having passed Congress, was vetoed by President Wilson on June 4, 1920, because of its provision that the President could not remove the Comptroller General and Assistant Comptroller General. The bill reintroduced in the Sixty-Seventh Congress, with this identical provision, was passed and approved June 10, 1921, by President Harding. The report in the Senate from the Special Committee on the National Budget reviews the difficulties the government had experienced in securing proper auditing of claims. We quote from this:

"The law requires that the accounts of fiscal officers and claims against the United States shall receive two separate and independent audits—one by the department or establishment concerned, spoken of as the administrative examination; the other by the accounting officers of the Treasury, usually alluded to as the Treasury examination."

"With respect to the administrative examination it would be fair to say that as many systems and plans of auditing the accounts of disbursing and collecting officers and claims against the United States are in vogue today as there are separate agencies of government. In some cases the administrative examination is a complete and full examination; in some cases it is woefully inadequate; and in other cases it exists in name only."

Speaking of the Comptroller General, the report states:

"This officer will receive, audit, and settle the accounts of all disbursing and collecting offices of the Government and all claims against the United States. He will perform generally the duties now intrusted to the auditors for the various departments."

Also:

"The bill as revised proposes to create an independent establishment to be known as the general accounting office, which will take over the powers and duties now exercised and performed by the Comptroller of the Treasury and the six Auditors of the Treasury Department in precisely the same fashion as is prescribed by the provisions of the House bill. The committee bill, however, goes further and confers upon the general accounting office the authority and power to prescribe and to supervise methods of accounting in the departments; to prescribe and supervise the methods employed in the administrative examination of accounts and claims; and to exercise in general a control over all the accounting procedures of the Government." S. Rep. 524, 66th Cong., 2nd Session.

The Budget and Accounting Act brought about the much-needed reform of a budget system in the government. The Comptroller General was to be appointed for a period of fifteen years, and could not be removed by the President, nor was he eligible for reappointment. The provisions of the law were to be exercised without direction from any other officer. It provided that the General Accounting Office "shall be independent of the executive departments and under the control and direction of the Comptroller General of the United States," and removed the authority and jurisdiction of accounting officers of the Treasury to the General Accounting Office, conferring on the Comptroller General all the powers and duties formerly exercised by the six Auditors of the Treasury Department and the Comptroller of the Treasury, and went even beyond this in granting authority to the Comptroller General. It gave

to the General Accounting Office power to settle all claims and demands by or against the government of the United States; to the Comptroller General power to prescribe the forms, systems, and procedures for the departments of the government in their "administrative examination of fiscal officers' accounts and claims against the United States." The term "administrative examination" is found in the act, and the report to the Senate referred to, supra, speaks of "administrative examination." It was intended to set up a department independent of the executive department under the control of the Comptroller General, and to make the balances certified by the Comptroller General final and conclusive upon the executive branch of the government. The act provides effectual methods for determining whether the appropriations of Congress are spent in the method and for the purposes provided by Congress.

We have reviewed somewhat the history leading up to the establishment of the General Accounting Office, for that history tends, we think, to throw light on the subject of the Comptroller General's powers. We do not see how, in view of the history of the accounting system of the government, and especially in view of section 71, 31 USCA, it can be claimed that the Comptroller General of the United States would have no authority to settle the matters arising under the contract involved in this case when requested so to do by the heads of departments having charge of the work.

What was the use of asking the Comptroller General to make direct settlement of this claim if he had no authority so to do, or if it had already been settled? Why did the Veterans' Bureau use the term "examined" instead of "settled" if it understood a final settlement had been made? The Chief of Bureau of Yards and Docks had made an "administrative examination," not an "administrative settlement." There could not be two final settlements. How can there be a final settlement when some other power has authority to turn it over and make another one? Section 74, c. 2, title 31, USCA, provides:

"Nothing in this chapter shall prevent the General Accounting Office from suspending items in an account in order to obtain further evidence or explanations necessary to their settlement."

If the claimed settlements of the heads of bureaus are final, then why are they not final as to the Comptroller General? How can a court say that, although under the act there

is general power in the Comptroller General to make settlements, to reopen matters and obtain further evidence necessary to a settlement, the "final settlement" under section 270 (40 USCA) is an entirely different thing, with which he had nothing to do? Congress has not said so.

We have examined the nine volumes of the Decisions of the Comptroller General containing matters passed on by him since the establishment of the office, and there are many cases where settlements have been made by him. This seems to be a recognized practice under the Budget and Accounting Act. A late decision of the Court of Claims, December 1, 1930, 69 Ct. Cl. —— (not yet printed in the reports), in the case of Bausch & Lomb Optical Co. v. United States, discusses a settlement of the Comptroller General sustaining in large part what the court designates as "final settlement" of the Comptroller General. There the Navy Department recommended a contractor be paid $16,743.67 as guard hire under a Navy contract, and the War Department paid it. The Comptroller General's office held in the settlement that the same should not have been paid, and charged the item against the contractor. The settlement was made administratively in the office of the Comptroller General.

In any consideration of the subject of final settlement as between the government and contractors, we meet continually the leading case known as the Peeler Case, supra. It is quite essential to determine what the Peeler Case did not, as well as did, decide. It has been supposedly followed in a large number of decisions by the inferior courts, in some of which it would seem to have been rather blindly followed, without consideration as to the machinery set up since that time for the settlement of obligations of the United States. The contract involved was for the construction of a post office building. The Illinois Surety Company was surety on the contractor's bond. The entire matter from beginning to end was in the Treasury Department. The action was one brought by subcontractors under the Act of February 24, 1905 (33 Stat. 811, c. 778). The court very clearly traces the system of settling accounts from the very foundation of the government up to the time of its decision, February 21, 1916, and draws the distinction between the word "settlement" as used in the acts of Congress and the word "payment." It holds the words "final settlement" in the act of 1905 to mean "the appropriate administrative determination with respect to the amount due," and

says: "We think that the words 'final settlement' in the Act of 1905 had reference to the time of this determination when, so far as the Government was concerned, the amount which it was finally bound to pay or entitled to receive was fixed administratively by the proper authority." It must be carried in mind that the construction of the building was in charge of the Secretary of the Treasury and the supervising architect. On August 21, 1912, the building having been completed, and the supervising architect having received satisfactory assurance that the work embraced in the contract had been performed, made out a statement, and recommended that a voucher be issued in a certain sum. This recommendation was approved, and the actual damages which seemed to be in controversy were changed, according to the supervising architect's recommendation, by direction of the Secretary of the Treasury. The court holds that this was the final settlement of the contract within the meaning of the act. At that time the different auditors for the various departments of the government were officials of the Treasury Department, and section 236 of the Revised Statutes placed in the Treasury Department the power to settle all claims and demands of the government exactly as section 71, title 31 USCA, now places that power in the General Accounting Office. So, of course, the approval under the direction of the Secretary was a final settlement.

Counsel for appellees in their brief call the court's attention to the fact that the contract in the Peeler Case was being administered by the Treasury Department, and that "the court was not called upon to pass on the ability of other administering departments to make a final settlement." The administering department in the Treasury made the final settlement, and that was the beginning and end of it, but that final settlement was not made until the Secretary of the Treasury approved the recommendation of the supervising architect.

If the court in the Peeler Case had not used the following language: "We think that the words 'final settlement' in the act of 1905 had reference to the time of this determination when, so far as the government was concerned, the amount which it was finally bound to pay or entitled to receive was fixed administratively by the proper authority," and: "As an administrative matter, it does not depend upon the consent or agreement of the other party to the contract or account," it could not have been in any way claimed as an authority for the position of appellees

herein, but, even taking this language, the amount which the government was finally bound to pay or entitled to receive was to be fixed administratively by the proper authority. The distinguished jurist did not define proper authority, nor did he designate what any particular official might be authorized to make final settlement. He emphasized that it was a matter for the proper authority acting for the government. The word "administratively" was evidently not used in a restricted sense and as applicable only to an official of the executive branch who had charge of contract work, but was used as counter distinguished from a judicial settlement. The opinion says: "The time of the final administrative determination of the amount due is a definite time, fixed by public record and readily ascertained. As an administrative matter, it does not depend upon the consent or agreement of the other party to the contract or account. The authority to make it may not be suspended, or held in abeyance, by refusal to agree. Whether the amount so fixed is due, in law and fact, undoubtedly remains a question to be adjudicated, if properly raised in judicial proceedings, but this does not affect the running of the time for bringing action under the statutory provision." If the Peeler Case can be held to be binding as an authority under the changed and enlarged law of the statute of June 10, 1921, there still remains the proposition as to what or who is the proper authority to administratively determine the amount due under the facts of this particular case. The Secretary of the Treasury in approving the settlement acted in an administrative capacity. How then can it be held that the Comptroller General, though acting independent of the Executive Branch, while doing the same thing under the new statute that the Secretary of the Treasury had done under the old, was not acting administratively in carrying out the purpose of legislative enactments involving the use of appropriated money? The trial court recognizes in its opinion that he had administrative functions. If the Comptroller General has power to certify balances which are "final and conclusive upon the Executive Branch of the Government," it would seem he had authority to finally settle the account involved in this case.

Some of the cases that have attempted to follow the Peeler Case have gone much beyond its holding, for that case did not hold that some settlement by some administrative officer who had no authority under the law to settle was a final settlement of a contract. The learned justice is careful to point out that the contract in question was a Treasury Department contract. It did not hold or indicate that the same conclusion would apply if the contract were in the Navy, Interior, or other departments of the government.

The two cases are cited in the Peeler Case, to which reference should be made. They are both District Court cases, namely, United States v. Bailey, 207 F. 782, and United States v. Massachusetts Bonding & Ins. Co., 215 F. 241.

In United States v. Bailey (D. C.) 207 F. 782, an action on the bond of a contractor under the Act of February 24, 1905, in favor of persons supplying material, it was held that the final settlement dated from the settlement and certification of the contractor's accounts after completion of the work by the proper auditor in the Treasury Department.

In United States v. Mass. Bonding & Ins. Co. (D. C.) 215 F. 241, it was held that a quartermaster's report was not a final settlement because the Treasury Department had still to pass upon that report. These cases, cited in the Peeler Case, would seem to indicate that the distinguished court did not give to the case the same construction that some of the cases purporting to follow it give. The Peeler Case certainly is not an authority against the power of the Comptroller General to make a settlement under the facts of this case.

We refer to some of the cases in the federal courts which give the Peeler Case as the reason for their decision. In most of them the matters involved occurred before the passage of the Act of June 10, 1921. In others they occurred before that time, though the decisions were after, and in a few the entire matter was subsequent to the passage of that act.

The cases of United States v. Title Guaranty & Surety Co. (C. C. A.) 254 F. 958; United States v. George F. Pawling & Co. (C. C. A.) 297 F. 65; Mandel v. United States (C. C. A.) 4 F.(2d) 629; United States Fidelity & Guaranty Co. v. McNulty Bros. (C. C. A.) 13 F.(2d) 78, all concerned alleged final settlements of Navy Department contracts, prior to 1921, and all purport to follow the Peeler Case. Robinson v. United States (C. C. A.) 251 F. 461, also prior to 1921, arose in the Treasury Department, and settlement was there made as in the Peeler Case.

In United States v. Title Guaranty & Surety Co. (C. C. A.) 254 F. 958, the building had been completed, the government had

accepted the work, and occupied the same prior to the time the final voucher was issued. The voucher was prepared by the public works officer, who represented the government in the construction of the building, and his statement was termed "final voucher." The contractor had certified to its correctness. It was examined and approved by the Acting Chief of the Bureau in charge of construction. The court held the date of the approval of the voucher constituted the date from which the six-month period ran. The court states: "We conclude that in cases where the government has clearly indicated that it has no claim against the surety, a final settlement within the purview of this act has taken place." Page 962. That is the Act of February 24, 1905.

Mandel v. United States (C. C. A.) 4 F. (2d) 629, was decided after the Budget and Accounting Act of 1921, though the contract was performed prior thereto. The settlement seems to be based on the statement of some employee that the final settlement rested with one Sparks of the Civil Engineer Corps. In United States v. George F. Pawling & Co. (C. C. A.) 297 F. 65, the settlement was based on a letter from Parks, Chief of the Bureau of Yards and Docks, to the public works officer. Voucher was drawn and approved, and was paid. The court held that was a settlement, quoting with approval language from United States v. Robinson, 214 F. 38, 40 (Second Circuit), which case arose before 1921, and was one in the Treasury Department. In this latter case the court said: "We take it that these italicized words refer to the time when the proper government officer, who has the final discretion in such matters, after examination of the facts, satisfies himself that the government will accept the work, as it is, without making any claim against the contractor for unfinished or imperfect work, damages for delay or what not, and records that decision in some orderly way." Of course, there the Treasury Department had final discretion in such matters, which brings that case in line with the Peeler Case.

In United States v. Starr (C. C. A.) 20 F. (2d) 803, the contract was entered into before passage of the Budget and Accounting Act. Settlement was made shortly thereafter. The court holds there may be a final settlement between the government and the contractor so as to fix the rights of creditors under the statute, notwithstanding the balance may be subject to change, that "when the government has clearly indicated that it has no further claim against the surety, a final settlement within the purview of the act has taken place." Page 807. The question may well arise as to this case as to just who is "the Government." If the Comptroller General is the representative of the government, and he indicates that there is no further claim against the surety, under the authority of this case it would be a final settlement. If some head of a bureau constitutes "the Government," then the situation is different. Referring to Union Gas Engine Co. v. Newport Shipbuilding Corporation (C. C. A.) 18 F. (2d) 556, the court says the word "settlement" is evidently used to convey "different meanings even by officials of the government."

In Southern Surety Co. v. Western Pipe & Steel Co. of California (C. C. A.) 16 F. (2d) 456, it does not appear whether the work was done before or after 1921, but the case was determined in 1926. The court held that the act of the Chief Engineer of the Bureau of Public Roads, in approving the estimate prepared by the District Engineer according to the established administrative methods of the department, was the final settlement, citing the Peeler Case.

In neither United States v. Starr, supra, nor Southern Surety Co. v. Western Pipe & Steel Co., supra, was any attention apparently given to the administrative machinery set up by the Budget and Accounting Act of 1921 for the final settlement of claims against the United States.

In United States, to Use of Union Gas Engine Co. v. Newport Shipbuilding Corp. (C. C. A.) 18 F.(2d) 556, the court held that date on which the United States authorized final payment to contractor was date of "final settlement" as limiting time for suit on contractor's bond.

The case of Antrim Lumber Co. v. Hannan, 18 F.(2d) 548, a decision of this court, is cited by appellees to sustain its position. That arose out of the construction of an annex to a government school building at the Fort Sill Indian School. The Antrim Lumber Company intervened and sought to recover for material furnished and used in the construction of the building. The question was raised that the performance and final settlement of the contract was over a year before the intervention, and that consequently intervener was barred. It was urged by the lumber company that there was no final settlement until the conclusion of the trial in the lower court and the failure of the United States to appeal, that the United States had not released its claim, and that final settle-

ment meant the time when the United States decides not to sue on the bond. This court said the matter was authoritatively settled by the Peeler Case, supra, and quotes from it at some length. The claim arose in the Antrim Case prior to the establishment of the General Accounting Office, and claims against the United States arising in the Interior Department were settled in the office of the Auditor of the Interior Department, who was one of the six Auditors of the Treasury. Paragraph 3, § 7, of the Act of July 31, 1894, 28 Stat. 206. It appears in the Antrim Case that the building was completed May 10, 1920; that on December 30, 1920, the Commissioner of Indian Affairs advised the contractor that his claim had been disallowed by the Auditor, and the demand of December 30, 1920, was evidently made after the Auditor's final settlement. The court held the final settlement was made on December 30, 1920, which was a few days after the Auditor had evidently passed on the matter and made final settlement.

We have heretofore pointed out the development of final settlements by Auditors, and in the Antrim Case it would appear there had been some action by the proper Auditor which constituted a settlement. This court says in that case that settlement means "an appropriate administrative determination of the amount which the government is finally bound to pay, or entitled to receive, as indicated by some public record or official act, and it does not depend, nor can the time be put off by a refusal to agree." Page 549. The official act in the case we are considering, to show the amount the government is finally bound to pay, is the action of the Comptroller General.

Undoubtedly some of these cases sustain the general theory of appellees as to the meaning of "final settlement," as that term is used in section 270, title 40, USCA. In none of them, however, is the situation exactly the same as here. We have discussed perhaps more than is necessary the cases which might assist in determining the question of what is a final settlement between the government and a contractor under the terms of section 270, title 40, USCA because of necessity they bear on the question of the authority of the Comptroller General to make final settlements on governmental contracts, which is the controlling question, under the particular facts of this case.

The Bureau of Yards and Docks and the Veterans' Bureau arrived at a sum which by virtue of their administrative examination they considered was the amount which the government was to pay, subject to a final settlement to be made by the Comptroller General. The fact that the contract provided how payment should be made, to wit, "upon vouchers prepared and certified by the Bureau of Yards and Docks, Navy Department, and approved by the Director, U. S. Veterans' Bureau," is not controlling. This refers to payment, not settlement, and, besides, the contract must be construed as if the statute then existing relative to settlement of claims and demands by or against the government were a part thereof.

Section 71, title 31, USCA, provided clearly for the settlement and adjustment in the General Accounting Office of all claims and demands whatever by the government or against it, either as debtor or creditor, and the voucher was sent to that office under the title of a claim for examination by that office for direct settlement. We are unable to agree with the trial court that the General Accounting Office and the Comptroller General had no jurisdiction to make final settlement, and that the appropriate administrative determination in this particular case as to the amount due was made by the Bureau of Yards and Docks and the Director of the United States Veterans' Bureau, and that they alone were capable of arriving at such determination. The Comptroller General, as appears from his reports, has examined and settled other claims, and there is no reason why he cannot, with the assistance of the respective bureaus having charge of the matter, ascertain the amount actually due under a contract. No final settlement was made here until it was made by the Comptroller General.

We do not, as indicated before, pass on the question of whether all settlements of claims and demands for or against the government must be made by the Comptroller General to be final settlements under section 270, title 40, USCA, as that question is not before us.

We hold the final settlement here was made by the Comptroller General when he certified on April 2, 1925, that he had "examined and settled the claim of Jones Engineering and Construction Co. for final payment," and not by the Bureau of Yards and Docks or the Director of the Veterans' Bureau. Therefore the intervention was within the year under section 270, title 40, USCA. In our judgment, the trial court was in error in dismissing the petition of intervention,

and the case is reversed and remanded for further proceedings in harmony with this opinion.

Reversed and remanded.