## UNITED STATES CASUALTY CO. v. DISTRICT OF COLUMBIA, to Use of NORTH AMERICAN CEMENT CORPORATION.

### No. 7255.

United States Court of Appeals for the District of Columbia.

Decided Oct. 9, 1939.

Morris Simon, Lawrence Koenigsberger, and Eugene Young, all of Washington, D. C., for appellant.

Dean Hill Stanley, of Washington, D. C., for appellee.

Before GRONER, Chief Justice, and MILLER and RUTLEDGE, Associate Justices.

RUTLEDGE, Associate Justice.

The appeal is from a judgment holding appellant United States Casualty Company liable as surety to appellee North American Cement Corporation, use-plaintiff be-

low, on the bond of the Lake Stone Company,[1] a contractor with the District of Columbia. The parties will be designated according to their respective positions in the trial court.

The bond was executed pursuant to Section 47, Title 20 of the District of Columbia Code (Supp. IV, 1938),[2] requiring contractors for public work in the District to furnish a penal bond and prescribing the time within which action may be instituted by the District and others to recover thereon. The material portion of the statute is set forth in the margin.[3] The principal question is whether the action was begun in time; or, stated differently, whether final settlement of the contract occurred more than one year prior to October 9, 1935, when suit was instituted.

The controversy grows out of facts to some extent identical with those set forth in Continental Casualty Co. v. North American Cement Corp., 1937, 67 App.D. C. 234, 91 F.2d 307.

The contract between Lake Stone Company and the District was for repairs on the latter's concrete highways and alleys during the fiscal year ending June 30, 1934. It incorporated the provisions of the Standard Specifications for Pavements, etc., issued by the Department of Highways of the District, including Paragraph 72 which requires certification by the "engineer"[4] upon completion of the work. The bond, in the penal sum of $93,300, was executed, as required by the statute, by Lake Stone with defendant Casualty Company as surety, conditioned upon performance of the work to the satisfaction and acceptance of the District Commissioners and the prompt payment of "all persons supplying it with labor and material in the prosecution of the work provided for in said contract".

The contract and the bond were executed on June 28, 1933, pursuant to bid previously awarded. Between the award and that date, plaintiff arranged, after negotiation with Lake Stone, to have its cement specified for the work. Because of plaintiff's policy of distributing only through building supply dealers and at its instance, the initial arrangement took the form of a contract by plaintiff to sell the cement to Potomac Builders Supply Company, a distributor which then or shortly afterward and before August 8, 1933, was operating under a creditors' committee. The contract specified prices for cement covering the requirements for the Lake Stone contract, and stated expressly that the material was "for resale to Lake Stone Company to be used in repairing concrete roadways in the District of Columbia". Deliveries began July 5, 1933, and continued to August 8 following, being made directly to Lake Stone, but billed during this period to Potomac Supply. Potomac Supply found the contract burdensome almost immediately and requested plaintiff to arrange for invoicing directly to Lake Stone. On August 8, pursuant to this request and

---

[1] The Company was named as a party defendant in the trial court, but was not served with process and did not appear. No issue is made on this account.

[2] 47 Stat. 608 (1932).

[3] "If no suit should be brought by the District of Columbia within six months from the completion and final settlement of said contract, then the person or persons supplying the contractor with labor and materials shall, upon application therefor, and furnishing affidavit to the District of Columbia that labor or materials for the prosecution of such work has been supplied by him or them, and payment for which has not been made, be furnished with a certified copy of said contract and bond, upon which he or they shall have a right of action, and shall be, and are hereby, authorized to bring suit in the name of the District of Columbia in the Supreme Court of the District of Columbia, irrespective of the amount in controversy in such suit, and not elsewhere for his or their use and benefit, against said contractor and his sureties, and to prosecute the same to final judgment and execution: Provided, That where suit is instituted by any of such creditors on the bond of the contractor it shall not be commenced until after the complete performance of said contract and final settlement thereof, and shall be commenced within one year after the performance and final settlement of said contract, and not later * * * ."

[4] "Engineer" is defined in Paragraph 1 of the Standard Specifications as "The director of highways, department of highways, District of Columbia, the engineer of streets, street division, department of highways, District of Columbia, acting directly or through an assistant or other representative duly authorized, such assistant or representative acting within the scope of the particular duties assigned to him or of the authority given him."

with the consent of Lake Stone, plaintiff "change(d) this billing to the Lake Stone Company" and thereafter the cement was invoiced directly to it. It does not appear that there was any change in the prices or other terms of the contract, except to substitute Lake Stone for Potomac Supply as the purchaser. The circumstances strongly indicate that the arrangement providing for sale originally to Potomac Supply and "resale" by it to Lake Stone was in purpose and fact one for the accommodation of plaintiff.

Lake Stone continued performance, receiving cement from plaintiff, until March 27, 1934, when it declared itself in default, being unable to complete the contract with the District. The same day it requested and authorized the Commissioners to mail checks payable to itself to "Lake Stone Company, % U. S. Casualty Company, 227 St. Paul St., Baltimore, Md." It also empowered an officer of defendant to endorse such checks. On April 12, following, defendant proposed to complete the contract for its principal through another contractor. Four days later the District Commissioners declared Lake Stone in default and accepted defendant's proposal. By agreement with defendant and Lake Stone, the District retained $5,088.61 on account of work performed in March, 1934, prior to default, as security for completion of the contract and pending determination of the cost of doing so. Lake Stone and defendant expressly agreed that the arrangement for completion of the work by defendant should not release their liabilities as principal and indemnitor under the bond or otherwise. Pursuant to these arrangements the work was completed June 30, 1934.

The procedure of the District for determining the amounts due contractors and making payments, both as the work progresses and finally, involves a lengthy series of steps through four governmental departments, namely, the Highway Department, which has charge of street construction and repairs, the Auditor's office, the Disbursing Officer, all of the District, and the General Accounting Office (Comp-troller General's Office). It is necessary to set forth the procedure in some detail.

In the Highway Department, the District inspector on the job sends in a daily report as to work done and materials used to the cost accounting office of the Engineer Division. From these reports monthly vouchers are compiled (which, in repair jobs, take the place of "measurement sheets" on new construction). The voucher also includes the totals of deliveries and payments (and other credits readily ascertainable) made for previous months. It constitutes, therefore, a convenient summary of the work done as well as of charges and credits to date, for use of the District officials in following the course of the job, and, in this case, the initial step toward a payment on account. The monthly voucher is "subject to correction in the final payment,"[5] and constitutes therefore only a tentative determination concerning the items contained in it. This is, ordinarily, a sufficient basis for monthly payments. From the cost accounting office the voucher goes to the Computing Engineer (Engineer Division), who, with a copy of the contract before him, checks all multiplication and determines whether the contract has been violated in any major respect (in this instance, including determination that the contractor had used the proper mix of cement under the specifications). The voucher then goes back to the cost accountant, who enters the amount in his cost account book against the proper appropriation, and forwards the voucher to the Engineer of Streets, who inspects it, and if satisfied, signs and sends it to the Director of Highways, who handles it likewise. If either is not satisfied, the voucher is returned, usually to the official from whom it was received; more rarely to another, such as the Corporation Counsel.

Approval by the Director of Highways results in sending the voucher to the office of the District Auditor. There it first is subjected to a preliminary audit, which includes checking the unit prices stipulated in the contract, the appropriation charged, and the voucher against the contract to see

---

[5] By specific provision of the Standard Specifications incorporated in the contract involved here. Paragraph 72 provides for final inspection of the project and certification by the engineer that the work has been completed and "as to the value thereof." It then provides:

"All prior certificates or estimates upon which payment may have been made being merely partial estimates are subject to correction in the final payment. The engineer shall certify the aforesaid certificate or quantities of work for final payment."

that the contract has been carried out. From the preliminary auditor the voucher goes to the Chief of the Audit Section, who is required, before approving it, to satisfy himself that the contractor has performed the contract as provided by its terms. If he is satisfied and approves the voucher, a check is drawn, the amount is posted against the account, and the check is signed by the Auditor and forwarded to the Disbursing Officer. The latter delivers the check to the contractor, who usually signs the voucher before the check is drawn. It does not appear at exactly what stage the contractor's signature is secured as a general practice. Finally, the original voucher goes to the bookkeeper, who includes it in his accounts, which are transmitted to the General Accounting Office, a duplicate being filed with the District Auditor.

To summarize, in the Highway Department the cost accountant compiles the monthly voucher from the inspector's daily reports. Then the voucher travels, in turn, to the Computing Engineer, back to the cost accountant, then to the Engineer of Streets, then to the Director of Highways. If approved by the latter, it goes to the District Auditor's office, first, to the preliminary auditor, then to the Chief of the Audit Section. If he approves it, the check is drawn, signed by the Auditor, sent to the Disbursing Officer, and by him delivered to the contractor. The voucher then goes to the bookkeeper and finally to the General Accounting Office. The procedure is elaborate, but little, if any, of it is perfunctory. Somewhere within it is the point of "final settlement" which we must ascertain and apply to the presented facts, unless departure from the routine in particular cases makes it inapplicable.

The normal procedure, of course, was not followed fully in this case, because its circumstances were abnormal. The procedure is not ironclad, and unusual occurrences create variations. The first of such occurrences here was the default of the contractor in March, 1934. Customary practice was followed in making up the monthly voucher on March 31 for work done before default in March. It was checked by the Computing Engineer on April 2. There normal practice ended until March 1, 1935, as will appear hereafter. The default stopped payment. The Engineer of Streets recommended to the Di-

rector of Highways that the entire matter be referred to the Corporation Counsel. The latter promptly reported to the District Commissioners, who followed his recommendations by formal order declaring the contractor in default, directing that the $5,088.61 for the March work "be retained pending satisfactory completion of said contract", and accepting defendant's proposal to complete it. Copies of the minutes of the Commissioners recording this action were sent to the Engineering Department, the Auditor, the Disbursing Officer, the Corporation Counsel, the General Accounting Office, and to Lake Stone, defendant and defendant's attorneys. Thus, the final authority in the District took charge of the matter, and in effect notified its own subordinates and outside parties immediately concerned, including defendant, that further and particularly final action on the completion of the contract and settlement thereof would be taken by that authority itself. Under these circumstances it is gravely doubtful that any subordinate official or department had authority to make final settlement on behalf of the District until after further action by the Commissioners. In any case, the effect of their action was to suspend further normal procedure as to the March voucher for an undetermined time.

The voucher appears to have been held in a state of suspended animation until January 17, 1935. On that date the Chairman of the Contract Board requested the Corporation Counsel to advise when and to whom the amount of the voucher should be paid, the request being prompted by applications of plaintiff and others for copies of the Lake Stone contract and bond, which the Chairman had declined previously to furnish "because final settlement has not been made". On January 31 following, the Corporation Counsel recommended to the Commissioners that the matter "be returned to the Highway Department, for the necessary approval of voucher for payment, and that it thereafter be held pending receipt of releases from the Lake Stone Company, Inc., and the United States Casualty Company", and that on receipt of the releases check "in settlement of this contract", payable to Lake Stone, be released to defendant. The Commissioners approved the recommendation on March 1, 1935. On March 6 next, the Engineer of Streets and the Director of Highways approved the voucher. Two days later de-

fendant executed the required release, Lake Stone having done so previously. The releases were attached to the voucher, and all sent to the Auditor's office, where the voucher resumed the customary course of procedure and was approved by the Chief of the Audit Section on March 22, 1935. On that date a check for $5,088.61 was drawn and signed by the Auditor. It was paid a week later.

The court below held that final settlement occurred on March 22, 1935. Defendant, however, asserts that this took place on July 2, 1934, or at any rate not later than July 19 of that year. The contention is based on the fact that the voucher for the last month's work, that for June, 1934, was approved by the Computing Engineer and signed by the Engineer of Streets on July 2. On July 19, it was forwarded by the Auditor to defendant, with the request that it be signed by an officer of defendant and returned to the Auditor's office together with a detailed sworn statement of all disbursements made by defendant in completing the contract, supported by documentary evidence. The voucher was signed by an officer of defendant and returned to the Auditor. On September 26, the defendant sent to the Auditor an affidavit, with supporting documents, showing disbursements. On October 11, the Auditor called defendant's attention to a discrepancy between the supporting documents and the record submitted by the company. On October 20, 1934, the defendant supplied evidence that the cost to it of completing the contract was $918.87 in excess of the amount payable by the District under the terms of the Lake Stone contract. On January 22, 1935, the Chief of the Audit Section made an affidavit, which was attached to the June voucher, that he had examined defendant's accounts, found that defendant had completed the contract, and that the work had cost it more than it was entitled to receive from the District. The June voucher was paid on or about February 19, 1935, by check dated January 30, 1935.

On September 27, 1934, and again on December 4, January 9 and February 25 following, plaintiff applied to District officials for copies of the Lake Stone contract and bond, in order to prepare for enforcing its claim for cement furnished and for which it had not been paid. The first request was denied for the assigned reason that the six months allowed for preferential suit by the District had not expired. So were the later ones, the District officials not being consistent in fixing the date of final settlement.[6] Finally, on March 11, 1935, plaintiff was notified that such settlement had occurred on March 6, and, in effect, that copies could be procured six months from that date. On September 5, 1935, plaintiff applied again and received the copies.

Heretofore there has been no judicial construction of "final settlement" under the District statute. However, counsel concede, and we have held,[7] that it is like the Heard Act,[8] which imposes similar restrictions on contractors with the United States and fixes identical statutory limitations for suits on contractors' bonds. Except for designation of the governmental unit, the language of the two statutes is substantially identical. The Heard Act, and particularly the phrase "after the complete performance of said contract and final settlement thereof", had received judicial construction prior to enactment of the District statute.[9] It is to be presumed, therefore, that in adopting it Congress intended the same principles to apply to District contracts as apply to those of the Government under the Heard Act. We consider the decisions construing the latter as controlling so far as applicable to the facts and issues presented here.

Under the Heard Act "final settlement", not completion of performance, is the crucial event for starting the statutory

---

6 Between September 27, 1934, and March 11, 1935, there was a change in the Chairmanship of the Contract Board of the District, W. N. Handiboe replacing R. M. Brennan. Mr. Brennan acted under the assumption that final settlement had occurred on July 2, 1934. Mr. Handiboe fixed the date as March 6, 1935. Other officials of the District appear to have agreed with Mr. Handiboe or to have considered that settlement did not occur in any event prior to 1935.

7 Continental Casualty Co. v. North American Cement Corp., 1937, 67 App. D.C. 234, 91 F.2d 307.

8 Act of Aug. 13, 1894, 28 Stat. 278, c. 280, as amended by the Act of Feb. 24, 1905, 33 Stat. 811, c. 778, and the Act of Mar. 3, 1911, 36 Stat. 1167, c. 231, § 291, 40 U.S.C. § 270 (1934), 40 U.S.C.A. § 270.

9 Cf. authorities cited in notes 10 and 12, infra.

periods.[10] This does not mean "payment"[11] or "agreement".[12] Nor, as will appear, does it involve absolute administrative finality, if that can occur short of or even with payment.[13] Instead, the Supreme Court has held that it means "A determination, made and recorded in accordance with established administrative practice by the administrative officer or department having the contract in charge, that the contract has been completed and that the final payment is due * * *."[14] Such a determination, it is said,[15] fulfills the policy of the Act[16] in two respects: first, in enabling those furnishing labor and materials to sue on the bond with reasonable promptness after the Government has determined it will have no claim on it; and, second, in fixing the time for bringing suit with reasonable certainty and finality. Necessarily, to preserve the Government's, or the District's, priority, the exact date must be flexible to some extent. Contracts vary in the difficulty of settlement. But most of them follow a routine of administrative determination which affords at some point a fairly definite and ascertainable decision concerning the amount the Government finds with rea-

sonable finality to be due on the entire transaction. That point, generally, is the one intended. The statute appears to contemplate settlement of the particular contract and therefore, in exceptional cases, to leave room for variation from the normal routine. But ordinarily the routine will apply, and so far as is reasonably possible, the extraordinary case should be assimilated to the normal one in the interest of certainty.

The determination, therefore, which is intended and controlling has the following characteristics in the usual case: it is one made by the administrative officer or department having charge of the work, not generally by the purely financial division of the Government;[17] it is made in accordance with established administrative routine, if such exists in relation to the particular matter; usually it is recorded in like accordance with routine; it is a determination both that the work has been completed and that a liquidated sum is due in final payment of all claims under the contract;[18] it can be ascertained by persons furnishing materials or labor with reasonable certainty so as to permit them to sue without undue danger of being ei-

---

[10] Illinois Surety Co. v. United States to the use of Peeler, 1916, 240 U.S. 214, 36 S.Ct. 321, 60 L.Ed. 609; Globe Indemnity Co. v. United States to the use of Steacy-Schmidt Mfg. Co., Inc., 1934, 291 U.S. 476, 54 S.Ct. 499, 78 L.Ed. 924.

[11] Illinois Surety Co. v. United States to the use of Peeler, 1916, 240 U.S. 214, 36 S.Ct. 321, 60 L.Ed. 609. In one case, the date of payment was held to be the time of settlement, but merely because numerous matters remained to be settled between the Government and the contractor up until that day. Pederson v. United States for the use of Washington Iron Works, 1918, 9 Cir., 253 F. 622.

[12] " * * * The word 'settlement,' in this usage, signifies an administrative determination by the proper authority of the amount due, regardless of the consent or agreement of the other party to the contract or account." United States Fidelity & Guaranty Co. v. United States to use of Smoot, 1924, 54 App. D.C. 342, 344, 298 F. 365, 367. Accord: Illinois Surety Co. v. United States to the use of Peeler, 1916, 240 U.S. 214, 36 S.Ct. 321, 60 L.Ed. 609; Robinson v. United States on Behalf of and for Use of Brown-Ketcham Iron Works, 2 Cir., 1918, 251 F. 461; Antrim Lumber Co. v. Hannan, 1927, 8 Cir., 18 F.

2d 548; cf. United States, to Use of Wennemer Construction Co., Inc. v. Arnold, D.C., 1920, 268 F. 130.

[13] Cf. notes 23-32, infra.

[14] Globe Indemnity Co. v. United States to the use of Steacy-Schmidt Mfg. Co., Inc., 1934, 291 U.S. 476, 54 S.Ct. 499, 501, 78 L.Ed. 924.

[15] Id.

[16] The Act is said to serve a dual purpose, first, to afford the Government adequate opportunity to enforce its demands against the surety and to protect its priority therein (Illinois Surety Co. v. United States, etc., note 10, supra); second, to protect those who furnish labor or materials for the work by the condition that the contractor or his surety will pay for them promptly (Globe Indemnity Co. v. United States, etc., note 10, supra). There is, of course, no provision for so-called mechanic's lien on governmental property. The contractor's bond provides a substitute for one.

[17] Globe Indemnity Co. v. United States to the use of Steacy-Schmidt Mfg. Co., Inc., 1934, 291 U.S. 476, 54 S.Ct. 499, 78 L.Ed. 924; H. G. Christman Co. v. Michigan Gypsum Co., 8 Cir., 1936, 85 F.2d 474.

[18] Cf. notes 30-33, infra.

ther premature or too late. It may be added that, to meet these requirements as nearly as possible, when an established administrative routine is shown to exist and apply, the search cannot be for the earliest possible moment at which, with hindsight from the date of the suit, it can be asserted that the sum total of money earned under the contract was ascertained. The settlement which is held "final" for fixing the periods of limitation is a settlement of the entire contract and of all substantial claims arising under it and its performance.[19] It is therefore not sufficient that there be a determination merely of charges, or of credits, or of amounts earned without regard to charges, other credits or contingent liabilities. The settlement involves an administrative statement of account, including all charges and credits deemed allowable by the department, after deciding, with intended finality so far as its functions are concerned, such matters as the sufficiency of performance, allowance of liquidated damages, contingent liabilities, etc. A determination that particular amounts may be due or paid merely as payments on account is not a final settlement.

 Applying these principles to the case at bar, we put aside at once all reference to the General Accounting Office,[20] as it had only to do with the function of audit after payment, and likewise the date of payment as such, as well as the functions of the Disbursing Officer, which are concerned only with payment, not with settlement. Nor can we accept either of the dates contended for by defendant, namely, July 2, 1934, when the Computing Engineer approved and the Engineer of Streets and the Director of Highways signed the June voucher, and July 19, 1934, when the Auditor forwarded this voucher to defendant for signature and return with supporting documents.

Defendant insists that the June voucher was a "final voucher", though for good reason it was not on the usual form for final vouchers. Defendant confuses a voucher for the last month's work with a final voucher in the sense, controlling here, of one intended as a final statement of account and settlement. Ordinarily, in cases involving no default, under the established routine relating to repair contracts, the voucher for the last month's work would be, in effect, a final one, if made and intended as such. But the June voucher was not a final voucher because it did not purport to determine finally, or at all, the net amount due on the total contract. By order of the Commissioners, the March voucher had been placed in cold, or at most lukewarm, storage. The amount earned in March before default by Lake Stone was an integral part of the contract. This amount was not included in the June voucher. The issues reserved concerning the March voucher were complex and uncertain, both in administrative and in legal aspects. Until decided administratively, full and therefore final settlement remained in suspension. When the June voucher was made up, it was impossible to tell whether the March voucher or any part of it would be payable to the contractor or the surety or both. The June voucher, therefore, was merely like any other monthly voucher, identical in all respects with those for April and May preceding, except that it reflected the work done in June. No more than they was it intended to be, or effective as, a final settlement. We do not regard the disposition of it, therefore, as affecting final settlement.

It is our view, consequently, that disposition of the March voucher is the controlling one. In effect, by the action of the Commissioners, it became the final voucher. Until decision was made by the proper authority concerning the amount claimed under it, no final settlement was had. On the peculiar facts, that decision was not made until after action was taken regarding it by the Commissioners on March 1, 1935. Prior to that time no department or subordinate official had authority or attempted to settle the account. All District officials, with one exception,[21] recognized that fact. They refused to conclude the matter with defendant and to furnish copies of the bond and Lake Stone contract to plaintiff. Until some administrative determination of the questions reserved in connection with this voucher[22]

---

[19] Subject to the exceptions referred to in notes 30-33, infra.

[20] Cf. note 17, supra.

[21] Cf. note 6, supra.

[22] The original reservation was a general one, relating to all questions which might arise concerning the completion of the contract, not specifically for the single purpose of determining who should receive an amount admitted to be due from the District. It was a reservation as against the surety, made

was had, no suit could have been instituted by the District (as for a declaratory judgment). The preferential period for asserting its claim had not begun to run. The deferred period for other claimants, therefore, had not started. Further, the Commissioners' action did not purport to be a final settlement. While it indicated a tentative judgment that the amount of the voucher was due, the resolution referred the voucher back to the Highway Department (not to the Disbursing Officer or the Auditor) "for the necessary approval of voucher for payment". In accordance with the Corporation Counsel's recommendation, it conditioned that approval on the securing of final and all-inclusive releases from defendant and Lake Stone. The voucher thus was returned to the normal routine, which it followed thereafter, subject to the additional requirement as to the releases. These were procured and cannot be regarded as having been merely perfunctory. On March 6, 1935, the Director of Highways approved and signed the voucher. Thereafter it followed the normal procedure of audit and payment.

We think final settlement occurred on March 6, 1935. Under the Heard Act, final settlement is made by the official or department which has charge of the work rather than by that in charge merely of auditing and disbursement.[23] That department here is the Department of Highways. The Auditor's office has important and discretionary functions, and were the question not affected by governing authority, there would be good reason, in the routine here, for holding that final settlement does not occur until favorable action by the Chief of the Audit Section or possibly by the Auditor, as was the view, apparently, of the trial court. But the functions of the Auditor's office are analogous to those performed by auditing divisions in the executive departments or by the General Accounting Office, whose actions have been held almost without exception[24] not to constitute or be essential to final settlement.[25]

Further, we think it is the final, not some preliminary or intermediate, action by the Highway Department which fixes the date. To set it earlier would create the confusion and uncertainty which must be avoided. The statutory period is brief. Prematurity in suit is as fatal as bringing it too late. The bar works at both ends of the short interval. To render either date indeterminable or only uncertainly determinable, in a practical sense, is to defeat the purpose of providing protection for claimants other than the District. Segmentation of the continuous process of the Department would tend to do this. No point in its work is so definite, certain and ascertainable as that at which it completes what it has to do with the matter. That point here is signature and approval by the Director of Highways. All that goes before is preliminary to his final judgment, and tentative until it is given. He is the highest official of the Department. His is the responsibility for its conduct. His approval is a customary part of the procedure. What is done previously is neither final nor certain, nor, as shown by this case, readily ascertainable outside the Department. The decisions, with a single exception which has come to our attention,[26] have fixed the date of final settlement as that on which the approval of the

---

specifically without releasing any rights against it under the contract or the bond, not one intended to release the surety from its obligations. Cf. notes 30, 31, infra. Nothing occurred to change the character of the reservation until the Commissioners took action regarding it on March 1, 1935.

[23] Globe Indemnity Co. v. United States to the use of Steacy-Schmidt Mfg. Co., Inc., 1934, 291 U.S. 476, 54 S.Ct. 499, 78 L.Ed. 924; Consolidated Indemnity & Ins. Co. v. W. A. Smoot & Co., 4 Cir., 1932, 57 F.2d 995; H. G. Christman Co. v. Michigan Gypsum Co., 8 Cir., 1936, 85 F.2d 474. Cf. Lambert Lumber Co. v. Jones Engineering & Construction Co., 8 Cir., 1931, 47 F.2d 74.

[24] That the entire matter of settlement may be referred by the administrative department in charge to the General Accounting Office, in which event the latter's action constitutes final settlement, see Lambert Lumber Co. v. Jones Engineering & Construction Co., 8 Cir., 1931, 47 F.2d 74; cf. Globe Indemnity Co. v. United States to the use of Steacy-Schmidt Mfg. Co., Inc., 1934, 291 U.S. 476, 484, 54 S.Ct. 499, 78 L.Ed. 924.

[25] Cf. note 23, supra.

[26] United States to use of McHugh Electric Co. v. Thomas Earle & Sons, Inc., 3 Cir., 1938, 99 F.2d 898. There the court felt difficulty because there was nothing in the record to show when, or if, the chief administrative official had approved the voucher. In the absence

highest administrative official having, or within the department having, charge of the work customarily passes upon the matter.[27] In each cited case, his signature or other approval was the last act necessary precedent to final auditing and payment. So here with the signature of the Director of Highways.[28] That the considered judgment of the District officials, and the one made effective in this case by them, supports the view we have taken is added reason for this determination.[29]

Some question may remain concerning the decisions which hold that retention by governmental authorities of specific amounts for various purposes in making "final" settlement with the contractor does not prevent such settlement from being final for starting the statutory period under the Heard Act.[30] Apart from any question which may exist as to the conclusiveness of these decisions until the issue is settled by the final authority, we do not regard them as in point or applicable to the situation presented here. In each there was action by the administrative official who customarily performed the last act prior to reference to disbursing officials for audit

of such a showing, the court chose the date on which the voucher was prepared in preference to the date on which settlement was certified by the Comptroller General.

[27] United States Fidelity & Guaranty Co. v. United States to Use of Smoot, 1924, 54 App.D.C. 342, 298 F. 365—Bureau of Yards and Docks; Illinois Surety Co. v. United States to the use of Peeler, 1916, 240 U.S. 214, 36 S.Ct. 321, 60 L.Ed. 609—the Treasury Department; Globe Indemnity Co. v. United States to the use of Steacy-Schmidt Mfg. Co., Inc., 1934, 291 U.S. 476, 54 S.Ct. 499, 78 L.Ed. 924—First Assistant Secretary of the Department of the Interior; United States ex rel. Brown-Ketcham Iron Works v. Robinson, 2 Cir., 1914, 214 F. 38—Secretary of the Treasury; Robinson v. United States, on Behalf of and for Use of Brown-Ketcham Iron Works, 2 Cir., 1918, 251 F. 461—Secretary of the Treasury; United States, for use of R. Haas Electric & Mfg. Co. v. Title Guaranty & Surety Co., 7 Cir., 1918, 254 F. 958—acting chief of the Bureau of Medicine and Surgery of the Navy; Mandel v. United States, to Use of Wharton & N. R. R., 3 Cir., 1925, 4 F.2d 629—the chief engineer; United States Fidelity & Guaranty Co. v. McNulty Bros., Inc., 1 Cir., 1926, 13 F.2d 78—Acting Secretary of the Navy; Antrim Lumber Co. v. Hannan, 8 Cir., 1927, 18 F.2d 548—Commissioner of Indian Affairs; Consolidated Indemnity & Ins. Co. v. W. A. Smoot & Co., Inc., 4 Cir., 1932, 57 F.2d 995—constructing quartermaster; Corell v. United States to Use of Roen, 6 Cir., 1935, 77 F.2d 161—Chief of Engineers of the Army; H. G. Christman Co. v. Michigan Gypsum Co., 8 Cir., 1936, 85 F.2d 474—the Assistant Administrator; United States, to Use of Wennemer Construction Co., Inc. v. Arnold, D.C., 1920, 268 F. 130—Bureau of Yards and Docks; cf. Southern Surety Co. v. Western Pipe & Steel Co., 9 Cir., 1926, 16 F.2d 456—

the chief engineer of the bureau of public roads.

[28] Action by his authorized deputy in performing the final act of approval is of course effective as the act of the highest administrative official.

[29] The only cases which have refused to give weight to the administrative opinion have been cases in which an administrator has stated his view casually or in such a way as to indicate that he was not thinking of "settlement" in the legal sense. United States, to Use of Union Gas Engine Co. v. Newport Ship-Building Corp., 4 Cir., 1927, 18 F.2d 556; United States, to Use of McHugh Electric Co. v. Thomas Earle & Sons, Inc., 3 Cir., 1938, 99 F.2d 898; United States, to Use of Wennemer Construction Co., Inc. v. Arnold, D.C., 1920, 268 F. 130. In the cases which have come to our attention, the considered judgment of the administrators has never been overruled by the courts. Cf. Illinois Surety Co. v. United States to the use of Peeler, 1916, 240 U.S. 214, 36 S.Ct. 321, 60 L.Ed. 609; American Bonding Co. v. United States, to Use of Francini, 3 Cir., 1916, 233 F. 364; Pederson v. United States, for the Use of Washington Iron Works, 9 Cir., 1918, 253 F. 622; United States, to Use of Wennemer Construction Co., Inc. v. Arnold, D.C., 1920, 268 F. 130.

[30] Robinson v. United States, on Behalf of and for Use of Brown-Ketcham Iron Works, 2 Cir., 1918, 251 F. 461; United States, for Use of R. Haas Electric & Mfg. Co. v. Title Guaranty & Surety Co., 7 Cir., 1918, 254 F. 958; Corell v. United States to Use of Roen, 6 Cir., 1935, 77 F.2d 161. Retention of a sum to insure complete performance was regarded as one of several arguments against final settlement in Pederson v. United States, for the Use of Washington Iron Works, 9 Cir., 1918, 253 F. 622, but it might not have been considered controlling in the absence of the other factors precluding settlement.

and payment, such as the General Accounting Office. In some the settlement clearly was intended to indicate that the Government made or would make no claim against the surety.[31] In others the purpose of the retention was apparently entirely irrelevant to settlement of the particular contract.[32] In the case which most closely approximates this,[33] retention was made of funds earned by a defaulting contractor pending completion of performance; but the issue was between a complete settlement of all issues by the highest administrative authority and a "certificate of settlement" issued later by the General Accounting Office. The former was held to fix the date of final settlement. The decision, therefore, supports the view here taken.

Contentions based upon the state of the pleadings remain for disposition. The original declaration alleged that plaintiff sold the materials in question to Potomac Supply for resale to Lake Stone, to be used by it in performing the contract with the District, and that all of the cement was delivered to Lake Stone and was used in the work. It asked judgment for $7,-792.50, with interest from March 26, 1934, and costs. The particulars of demand claimed for 11,483¼ barrels of one grade at $2.34 per barrel and 239 barrels of another grade at $2.84, delivered from July 5, 1933, to March 26 following, aggregating $27,549.57, with credits of $19,757.07 for payments, discounts, freight and bags returned during this period. At the trial, in December, 1937, the evidence showed the change in billing, from Potomac Supply to Lake Stone, on August 8, 1933. Accordingly, with the court's permission, the declaration was amended on December 13, 1937, to "conform to the proof", but actually to allege sale, as well as delivery, to Lake Stone of all cement used in the work.

At the same time, and as a consequence of our decision in Continental Casualty Co. v. North American Cement Corp., 67 App.D.C. 234, 91 F.2d 307, rendered May 10, 1937, the declaration and particulars of demand were amended further to increase the net amount claimed by $872.82. The same quantities were specified, but the rates were stated to be only $1.941 and $2.441 respectively, total deliveries thus aggregating only $22,872.39. Credits were recalculated, on the basis prescribed in the decision referred to, at $14,207.07, thus leaving an amount due of $8,665.32, as claimed in the amendment. The amended pleadings further alleged that payment had been made for all cement delivered between July 5, 1933, and November 6 of that year, and in effect claimed only for cement delivered after the latter date.

Defendant contends these changes stated a new cause or causes of action, either as to the entire amount claimed or as to the additional $872.82, and therefore, since the amendment was filed more than one year after final settlement under any possible date thereof, that appellee's cause of action was barred entirely or at any rate as to the amount by which the demand was increased.

The change in the amount demanded did not constitute statement of a new cause of action. Both alterations in the prices stated were downward. The change in the amount of the credits and the method of computing them resulted from the decision in Continental Casualty Co. v. North American Cement Corp., supra. We there disapproved the accounting by which plaintiff here had allocated payments and credits between Lake Stone and one Schlegel on account of their pooling agreement concerning performance of the contract involved here and a similar one between Schlegel and the District. The result was to increase the credits due Schlegel and decrease proportionally those due Lake Stone. The amendment was made to comply with that decision, introduced no new items of which defendant was not cognizant equally with plaintiff and none which surprised defendant or which did not arise out of the transaction originally alleged. It was merely a correction of the method of computing credits, not the introduction of new items of credit. Such a correction does not change the cause of action. Even new items of damage arising out of the same transaction may be added by amendment without stating a new cause of action, so long as the

---

[31] United States, for Use of R. Haas Electric & Mfg. Co. v. Title Guaranty & Surety Co., cit. supra, note 30; Robinson v. United States, etc., cit. supra, note 30.

[32] As for the purpose of offsetting indebtedness arising from other transactions. Corell v. United States to Use of Roen, cit. supra, note 30.

[33] H. G. Christman Co. v. Michigan Gypsum Co., 8 Cir., 1936, 85 F.2d 474.

same measure may be applied.[34] There was here merely the correction of a misconception as to the legally applicable rule for computing credits. The cause of action was originally, and remained, a claim for the unpaid balance of money due on the sale of 11,722¼ barrels of cement.

 Defendant's contention that changing the name of the purchaser changed the cause of action has been foreclosed by Continental Casualty Co. v. North American Cement Corp., supra. In the view we have taken, the only items of sale involved here were those made between November 6, 1933, and March 26, 1934. All such sales were made directly to Lake Stone, Potomac Supply having passed long previously entirely out of the picture. Without deciding whether the original arrangement introducing Potomac Supply at plaintiff's behest was only a subterfuge for an agency or other relation in which plaintiff was the real party in interest, we think the mere failure under the circumstances to designate properly in the original pleading the party with whom plaintiff contracted was only a defective statement of the cause of action, not misleading to defendant in any way, and subject to correction by later amendment without stating a new cause. The transactions which constituted the basis of the claim were never in doubt and were identical in the original pleading and the amendment. Defendant was informed by the pleadings at all times concerning the transactions and items of damage as to which claim was made, knew the actual facts concerning the contract relation, was not prejudiced in any way as to its defense by the technical and formal change made, and was put to no additional trouble by the amendment in making it.[35] It is not necessary therefore for us to go further and hold specifically that the statement of a contract relation between the plaintiff and a contractor or subcontractor is not essential.[36] Such statement has been made here sufficiently by the amendment and its relation back to the original declaration.

 On the appeal, the parties have stipulated that if the judgment be affirmed as to the $8,665.32 awarded to plaintiff, interest should be allowed upon $7,792.50 thereof from October 9, 1935, and upon the remaining $872.82 from December 13, 1937. The trial court awarded interest on the entire amount from September 28, 1934. In accordance with the stipulation, the judgment is modified to allow interest as agreed therein, and as so modified is

Affirmed.

---

[34] Armstrong & Latta v. Philadelphia, 1915, 249 Pa. 39, 94 A. 455, Ann.Cas. 1917B, 1082. Cf. Lost Creek Coal & Mineral Land Co. v. Hendon, 1926, 215 Ala. 212, 110 So. 308; Church v. Syracuse Coal & Salt Co., 1865, 32 Conn. 372; Schwab Clothing Co. v. St. Louis, I. M. & S. Ry., 1897, 71 Mo.App. 241; Knight v. Quincy, O. & K. C. R. R., 1906, 120 Mo.App. 311, 96 S.W. 716.

[35] Cf. A. C. Motor Freight Lines, Inc. v. Shingledecker, 7 Cir., 1934, 70 F.2d 827; Missouri, Kansas & Texas Ry. v. Wulf, 1913, 226 U.S. 570, 33 S.Ct. 135, 57 L.Ed. 355, Ann.Cas.1914B, 134; Illinois Surety Co. v. United States to the use of Peeler, 1916, 240 U.S. 214, 36 S. Ct. 321, 60 L.Ed. 609. Though not adopted until after the trial here, the New Federal Rules of Civil Procedure support this view. See Rule 15. Cf. Moore, Federal Practice under the New Federal Rules (1938) c. 15.

[36] Cf. Continental Casualty Co. v. North American Cement Corp., 1937, 67 App.D.C. 234, 91 F.2d 307, 308-309, discussing United States to the use of Hill v. American Surety Co., 1906, 200 U.S. 197, 204.